No. 01-199

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 240

FILED

OCT 3 1 2002

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

RUSSELL EDWARD DORWART and HARRY DORWART,

Plaintiffs, Appellants and Cross-Respondents,

v.

PAUL CARAWAY, individually, and as a deputy in the Stillwater County Sheriff's Office; DANNY AMES, individually, and as a deputy in the Stillwater County Sheriff's Office; CLIFF BROPHY, individually, and as Sheriff of Stillwater County, Montana; and COUNTY OF STILLWATER, State of Montana,

Defendants, Respondents and Cross-Appellants.

APPEAL FROM:    District Court of the Twenty-Second Judicial District,
In and for the County of Stillwater,
The Honorable Maurice R. Colberg, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Gary R. Thomas, Thomas Law Office, P.C., Red Lodge, Montana

For Respondents:

Steven R. Milch, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Montana

For Amicus Montana Trial Lawyers Association:

Lawrence A. Anderson, Attorney at Law, Great Falls, Montana

For Amicus Montana Defense Trial Lawyers Association:

Stanley T. Kaleczyc, Mary K. Giddings, Browning, Kaleczyc, Berry & Hoven, Helena, Montana

For Amicus Bill of Rights Committee:

Wade Dahood, Attorney at Law, Anaconda, Montana

Argued and Submitted:  March 19, 2002
Decided:  October 31, 2002

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1    This matter was previously before the Court in *Dorwart v. Caraway*, 1998 MT 191, 290 Mont. 196, 966 P.2d 1121 (*Dorwart I*). There, we held that the Plaintiffs' state constitutional rights to due process, privacy and the right to be free from unreasonable searches and seizures were violated. We remanded to the District Court for the Twenty Second Judicial District in Stillwater County for further consideration of the Plaintiffs' claims for damages and attorney's fees caused by the violation of those rights. Both parties filed motions for summary judgment. The District Court held that a private right of action is available for the violation of the state constitutional rights to privacy and to be free from unreasonable searches and seizures and that damages are recoverable. However, the Court also held that the Defendants were entitled to immunity pursuant to § 2-9-103(1), MCA, for having reasonably relied on the previous law of Montana. Therefore, the District Court granted summary judgment to the Defendants, dismissed the Plaintiffs' claims for damages and denied Plaintiffs' claims for attorney's fees. Plaintiffs appeal the District Court's order dismissing their complaint by summary judgment. Defendants cross-appeal the District Court's conclusion that there exists in Montana a cause of action and claim for damages for violation of state constitutional rights. We affirm in part and reverse in part the order and judgment of the District Court.

¶2    The issues on appeal are:

¶3    1. Does violation of rights guaranteed by the Montana Constitution give rise to a cause of action for damages?

2

¶4   2. If the answer to the previous question is in the affirmative, did the Defendants have statutory immunity based on the facts in this case pursuant to § 2-9-103(1), MCA?

¶5   3. If there is a cause of action for damages caused by violation of those rights guaranteed by the state constitution, and if Defendants in this case were not immune pursuant to § 2-9-103(1), MCA, should this Court create qualified immunity analogous to federal qualified immunity as applied in claims pursuant to 42 U.S.C. § 1983, and, if so, were Defendants in this case entitled to summary judgment on that basis?

¶6   4. Did the District Court err when it denied Plaintiffs' claim for an award of attorney's fees?

## FACTUAL BACKGROUND

¶7   The following facts are taken, in part, from our prior decision in *Dorwart I* and are, in part, based on further discovery completed following remand by this Court to the District Court.

¶8   The Plaintiff, Russell Dorwart, was named as a defendant in two separate Stillwater County Justice Court actions. Default judgments were entered against him in both actions and writs of execution were issued to enforce those judgments on March 12 and April 9, 1991, respectively.

¶9   On the evening of April 11, 1991, while operating his motor vehicle, Russell Dorwart was stopped by the Defendant, Deputy Sheriff Danny Ames, and served with the two writs of execution. Ames also arrested Dorwart for driving under the influence of alcohol, seized the pickup truck and transported Dorwart to the Stillwater County Jail. After Dorwart was

3

incarcerated in the jail, either Ames or the Defendant, Deputy Sheriff Paul Caraway, advised Dorwart that the two of them were going to his home to seize property pursuant to the writs of execution. They were advised by Dorwart that the only unlocked door was the back door but that they should be careful not to let his cat out when they entered his home. Dorwart also advised the deputies that his wallet and driver's license were on the dashboard of his mother's car, which was parked in his driveway. Although the deputies claim to have interpreted Dorwart's remarks as permission to enter his home, they did not directly ask his permission nor did he grant it. Caraway and Ames worked for the Defendant, Stillwater County Sheriff Cliff Brophy.

¶10    Ames and Caraway proceeded to Dorwart's residence, entered the house and the garage, and seized various items of personal property pursuant to the writs of execution. They also took Dorwart's wallet from the dashboard of the car.

¶11    In depositions taken, subsequent to remand, Caraway testified that he believed he had authority to enter Dorwart's house based on his conversation with Dorwart, his conversation with Justice of the Peace, Marilyn Kober, and the writ of execution that Kober issued. However, he conceded that Kober's only order was the writ of execution she issued and all he was otherwise told by her was that he should go to Dorwart's house to seize his property. He conceded that his conversation with Dorwart occurred while Dorwart was in jail and that after he or Ames told Dorwart they were going to his house to seize property, he was simply told to use the back door because the other doors were locked and to be careful that the cat did not get out. Caraway realized that his oral conversation with Kober was not by itself

4

sufficient to authorize entry into a home, he had no warrant to enter Dorwart's home, and he agreed *that the writ of execution did not specifically authorize him to enter Dorwart's residence and search it.*

¶12 Ames testified that he believed he was authorized to enter Dorwart's home pursuant to the writs of execution and based on his conversation with Dorwart. However, he also acknowledged that the writs did not specifically provide that he could enter the house and that the only thing he was told by Dorwart was to use the back door and not let the cat out after Dorwart had been advised that the deputies were going to his house to seize property. Both Caraway and Ames testified that upon entry into Dorwart's home, neither made any effort to distinguish between exempt and nonexempt property.

¶13 Dorwart's pickup truck, its contents and his wallet were returned to him several days later. On April 18, 1991, Dorwart filed in Justice Court a Motion for Release of Property and to Quash the Writs of Execution, supported by an Affidavit of Exemption and other affidavits, asserting that the personal property which Ames and Caraway had seized from his house and garage was either exempt from execution or did not belong to him. On September 30, 1991, the Justice Court ordered that all of the property seized from Dorwart's house and garage be returned to its rightful owners. Dorwart subsequently retrieved the property from the jail.

5

## PROCEDURAL HISTORY

¶14    On April 5, 1993, the Plaintiffs, Russell Dorwart and Harry Dorwart, filed a complaint in which Caraway, Ames, Brophy and the County of Stillwater were named as defendants. The Plaintiff Harry Dorwart owned the home in which Russell resided.

¶15    Plaintiffs alleged that Caraway and Ames unlawfully entered Russell's residence where they conducted an unlawful and unreasonable search and seizure of his property, trespassed, invaded his privacy, wrongfully converted his property, and violated his right to due process of law. It alleged that Brophy and Stillwater County were vicariously liable for the deputies' conduct and for grossly negligent supervision of the deputies.

¶16    The Plaintiffs' complaint set forth claims for damages based on the Defendants' alleged violations of Article II, Sections 10 (right to privacy), 11 (right to be free from unreasonable searches and seizures), and 17 (right to due process) of the Montana Constitution. They also claimed damages pursuant to 42 U.S.C. § 1983 for violation of their rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and alleged a right to damages for common law trespass and conversion. Plaintiffs claim they were entitled to the recovery of attorney's fees as part of both their federal and state causes of action. Dorwarts' complaint was subsequently amended to state claims for declaratory judgment that Montana's post-execution statutes were in violation of state and federal rights to due process of law.

¶17    On August 7, 1995, the District Court entered its first order granting summary judgment. That order was the subject of our decision in *Dorwart I*. It concluded that

6

Montana's postjudgment execution statutes did violate Russell Dorwart's right to due process of law but that the deputies had committed neither trespass nor conversion, nor had they violated Dorwart's constitutional rights to privacy or to be free from unreasonable searches and seizures. Finally, the District Court held that although Dorwart's right to due process of law had been violated, the deputies were entitled to qualified immunity pursuant to *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396, and neither Brophy nor Stillwater County were liable pursuant to 42 U.S.C. § 1983. Dorwart's claims for attorney's fees were also denied.

¶18    In *Dorwart I*, we held that because Caraway and Ames did not have a search warrant, Dorwart did not consent to their entry of his home, and there were no exigent circumstances nor any other established exception to the search warrant requirement, the deputies' entry into Dorwart's home and seizure of his property violated his right to be free from unreasonable searches and seizures pursuant to Article II, Section 11 of the Montana Constitution. *Dorwart I,* ¶ 27. We also specifically held that neither the writs of execution themselves nor Montana's postjudgment execution statutes pursuant to which the writs were issued expressly directed or authorized the deputies to enter Dorwart's home to effectuate seizure of his property. *Dorwart I,* ¶¶ 33, 48 and 52.

¶19    We held that the District Court erred when it concluded that the deputies' entry into Dorwart's home did not violate his right to privacy guaranteed by Article II, Section 10 of the Montana Constitution, and held that because the District Court had erroneously concluded that Dorwart's right to privacy and to be free from unreasonable searches and seizures had

7

not been violated, its consideration of Dorwart's claims for those violations had terminated prematurely. *Dorwart I*, ¶¶ 60-61. We, therefore, remanded for further proceedings to consider those state constitutional claims. *Dorwart I*, ¶ 61.

¶20 We also held that because Montana law in Title 25, Chapter 13, Part 6, of the Montana Code Annotated provides that certain property is exempt from execution to enforce a judgment, Montana debtors have a property interest in those statutory exemptions protected by the due process guarantees of the Montana Constitution found at Article II, Section 17 (*Dorwart I*, ¶ 75); and that Montana's post-execution statutes violated Dorwart's right to due process because they did not provide him notice of the seizure of his property, of the availability of statutory exemptions from execution, of where to locate additional information about exemptions, of the procedures by which to claim his exemptions, and because he was not provided with a prompt hearing at which to claim his property exempt from execution. *Dorwart I*, ¶ 103. However, after concluding that Dorwart's state constitutional right to due process had been violated, we mistakenly omitted remanding to the District Court for further consideration of that claim.

¶21 Finally, a majority of this Court concluded that at the time of Ames' and Caraway's entry into Dorwart's home to execute on his property, the law regarding his constitutional rights to privacy, to be free from searches and seizures and to due process as it interrelated with the law regarding postjudgment execution, had not been clearly established. Therefore, we affirmed the District Court's summary dismissal of Dorwart's claims for common law

8

trespass and conversion, for damages pursuant to 42 U.S.C. § 1983, and for attorney's fees. *Dorwart I*, ¶¶ 112, 120, 126 and 132.

¶22    In conclusion, we stated:

> Thus, we conclude that Dorwart's arguments regarding entitlement to attorney's fees on his claims under Article II, Sections 10 and 11 of the Montana Constitution must be remanded in conjunction with our remand of those constitutional claims for further proceedings.

*Dorwart I*, ¶ 134.

¶23    However, because Dorwart has at all times claimed violations of not just Article II, Sections 10 and 11, but also Article II, Section 17, and because our prior opinion established violations of all three sections to the Montana Constitution, our remand should properly have included consideration of Dorwart's claim for violation of his right to due process guaranteed by Article II, Section 17.

¶24    Following remand to the District Court, all parties again moved for summary judgment. In support of the Defendants' motion, the Defendants contended that there is no authority to support a private action for damages based on violations of the Montana Constitution and that if a direct cause of action is authorized, Defendants are entitled to either qualified immunity analogous to that which is provided for violations of federal civil rights, or statutory immunity pursuant to § 2-9-103(1), MCA. Defendants contended that Dorwart is not entitled to attorney's fees for the same reason that he was not entitled to attorney's fees for violation of his federal civil rights.

9

¶25 Plaintiffs contended that they are entitled to claim damages for violation of their state constitutional rights based on the Restatement of Torts, the U.S. Supreme Court's decision in *Bivens v. Six Unknown Fed. Narcotics Agents* (1971), 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, and based upon the English Common Law as interpreted in numerous other states.

¶26 In a thoughtful and comprehensive order and memorandum entered by the District Court on November 17, 2000, the District Court concluded after consideration of various authorities that plaintiffs in general are entitled to bring a claim for money damages based on the violation of their state constitutional rights but that in this case, Defendants had acted in reliance on the law as it existed at the time of their conduct and were, therefore, entitled to statutory immunity pursuant to § 2-9-103(1), MCA. Because it held that Defendants were entitled to immunity pursuant to statutory law, the Court did not extensively discuss the common law concept of qualified immunity and did not determine whether it applied in this case. Pursuant to the general rule that prevailing parties in civil actions are not entitled to attorney's fees absent a contractual agreement or expressed statutory authority and because neither was found in this case and no special circumstances were found to exist, attorney's fees were denied.

¶27 Both parties appeal. We affirm in part and reverse in part the order and judgment of the District Court.

10

## STANDARD OF REVIEW

¶28 Our standard of review of a district court's order granting summary judgment is de novo; we apply the same criteria pursuant to Rule 56, M.R.Civ.P., that controls the district court's decision. *Clark v. Eagle Systems, Inc.* (1996), 279 Mont. 279, 283, 927 P.2d 995, 997 (citations omitted). A party seeking summary judgment must establish the absence of any genuine issue of material fact which would allow the nonmoving party to recover an entitlement to judgment as a matter of law. Rule 56(c), M.R.Civ.P.; *Clark*, 279 Mont. at 283, 927 P.2d at 997-98.

¶29 Here, in spite of additional discovery subsequent to our remand, the material facts are still undisputed and the issues on appeal relate solely to how the law applies to those facts. We review a district court's conclusions of law to determine whether those conclusions are correct. *Albright v. State, By and Through State* (1997), 281 Mont. 196, 205, 933 P.2d 815, 821 (citation omitted).

## DISCUSSION

## ISSUE 1

¶30 Does violation of rights guaranteed by the Montana Constitution give rise to a cause of action for damages?

¶31 By 1998, twenty-one states had recognized an implied cause of action for state constitutional violations. Three additional states had indicated that they would do so under certain narrow circumstances. A private cause of action has been recognized in a twenty-fifth state by federal courts and four states have enacted statutes which authorize causes of

11

action for violation of state constitutional rights. Seven states have specifically rejected state constitutional causes of action. *See* Gail Donoghue & Jonathan I. Edelstein, *Life After Brown: The Future of State Constitutional Tort Actions in New York*, 42 N.Y.L. Sch. L. Rev. 447, 447 n.2 (1998).[1] Furthermore, the majority of legal scholarship on the topic of state constitutional tort actions has favored an expansive right of action. 42 N.Y.L. Sch. L. Rev. at 450 n.12. The analytical framework for consideration of claims for violation of state

---

[1] Footnote two provides:

> Prior to the New York Court of Appeals' decision in Brown, 19 states and Puerto Rico recognized an implied cause of action for state constitutional violations prior to the Brown decision. The states in which such a cause of action has been recognized by the highest state court are California, Illinois, Louisiana, Maryland, Michigan, New Jersey, New Mexico, North Carolina, Pennsylvania, Utah, Vermont and West Virginia. Four additional states: Arkansas, Maine, Massachusetts, and Nebraska, have enacted statutes providing private causes of action for violation of state constitutional rights under certain circumstances. Direct causes of action based on the Florida and Wisconsin Constitutions have also been recognized by certain lower courts of those states, but not by either state's highest court. In addition, subsequent to the court of appeals' decision in Brown, the Connecticut Supreme Court recognized a private right of action for violations of certain Connecticut constitutional provisions, resolving an issue which had previously been in dispute among the lower courts in that state. See Binette v. Sabo, No. SC-15547, at 3 (Conn.Mar. 10, 1998).
>
> Seven states: Colorado, Georgia, Hawaii, Oregon, Tennessee, Texas, and Washington, have specifically rejected state constitutional causes of action. In addition, although the Alaska, New Hampshire, and Ohio courts have never recognized a private state constitutional right of action, they have indicated that they would do so under certain narrow circumstances. Finally, a private right of action has been implied from the Rhode Island Constitution, but only by federal courts. It should be further noted that this list does not include states which have recognized rights of action based upon constitutional provisions requiring just compensation for takings of private property for public use. See infra note 284 and accompanying text (discussing the unique place of just compensation clauses in constitutional tort jurisprudence).

constitutions varies from state to state. However, any discussion of a claim for violation of constitutional rights begins with *Bivens*.

¶32 In *Bivens*, the plaintiff complained that federal narcotics agents entered his apartment, arrested him, manacled him in front of his family, and threatened to arrest his entire family. He was then taken to a federal courthouse where he was interrogated, booked, and subjected to a visual strip search. He filed a complaint for damages for his warrantless search and arrest and for the agents' unreasonable use of force. That complaint was dismissed by the district court. The dismissal was affirmed by the Second Circuit Court of Appeals. However, the U.S. Supreme Court granted certiorari and reversed the dismissal. On appeal, the defendant federal agents contended, as do the Defendants in this case, that Bivens' exclusive remedy should be pursuant to state tort law. They contended that because he had a state tort remedy, there was no need for a cause of action to vindicate his constitutional rights. The Supreme Court disagreed and distinguished common law torts from the violation of constitutional rights. In language repeatedly cited by state courts considering the same issues, the Court stated:

> Respondents seek to treat the relationship between a citizen and a federal agent unconstitutionally exercising his authority as no different from the relationship between two private citizens. In so doing, they ignore the fact that power, once granted, does not disappear like a magic gift when it is wrongfully used. An agent acting–albeit unconstitutionally–in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own. Accordingly, as our cases make clear, the Fourth Amendment operates as a limitation upon the exercise of federal power regardless of whether the State in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen. It guarantees to citizens of the United States the absolute right

13

to be free from unreasonable searches and seizures carried out by virtue of federal authority. And 'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.' [Citations omitted.]

*Bivens*, 403 U.S. at 391-92, 91 S.Ct. at 2002.

¶33 The Court proceeded to make the following distinction between those interests protected by state laws regulating trespass and those protected by the constitutional right to be free from unreasonable searches and seizures:

> The interests protected by state laws regulating trespass and the invasion of privacy, and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be inconsistent or even hostile. Thus, we may bar the door against an unwelcome private intruder, or call the police if he persists in seeking entrance. The availability of such alternative means for the protection of privacy may lead the State to restrict imposition of liability for any consequent trespass. A private citizen, asserting no authority other than his own, will not normally be liable in trespass if he demands, and is granted, admission to another's house. But one who demands admission under a claim of federal authority stands in a far different position. The mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist an unlawful entry or arrest by resort to the local police; and a claim of authority to enter is likely to unlock the door as well. 'In such cases there is no safety for the citizen, except in the protection of the judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime.' [Citations omitted.]

*Bivens*, 403 U.S. at 394-95, 91 S.Ct. at 2003-04.

¶34 The Supreme Court held that while the Fourth Amendment did not expressly provide for its enforcement by an award of money damages for its violation, "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. . . .

14

[F]ederal courts may use any available remedy to make good the wrong done." *Bivens*, 403

U.S. at 395-96, 91 S.Ct. at 2004 (citations omitted).

¶35    The Supreme Court held that:

> Having concluded that petitioner's complaint states a cause of action under the
> Fourth Amendment, supra, at 2001–2004, we hold that petitioner is entitled to
> recover money damages for any injuries he has suffered as a result of the
> agents' violation of the Amendment.

*Bivens*, 403 U.S. at 397, 91 S.Ct. at 2005.

¶36    Subsequently the Supreme Court has held that money damages can be recovered for

violations of the Fifth Amendment's guarantee of due process and the Eighth Amendment's

prohibition against cruel and unusual punishment. *See Davis v. Passman* (1979), 442 U.S.

228, 99 S.Ct. 2264, 60 L.Ed.2d 846, and *Carlson v. Green* (1980), 446 U.S. 14, 100 S.Ct.

1468, 64 L.Ed.2d 15, respectively.

¶37    The general principle of *Bivens* and its progeny is set out clearly in Restatement

(Second) of Torts § 874A (1979), which provides:

> When a legislative provision protects a class of persons by proscribing or
> requiring certain conduct but does not provide a civil remedy for the violation,
> the court may, if it determines that the remedy is appropriate in furtherance of
> the purpose of the legislation and needed to assure the effectiveness of the
> provision, accord to an injured member of the class a right of action, using a
> suitable existing tort action or a new cause of action analogous to an existing
> tort action.

¶38    Section 874A, comment a, makes clear that the term "legislative provision" includes

a constitutional provision.

15

¶39    In those states which have considered and permitted a claim for damages for violation of state constitutional rights, various analytical models have been employed. In Vermont, the state supreme court used a two-step inquiry by which it first considered whether the provisions at issue were self-executing and, if so, whether monetary damages should be available as a remedy for a violation. It held that a general provision guaranteeing a right to enjoy life was not self-executing but that the specific guarantee of right to free speech was self-executing and after considering *Bivens* and the Restatement, held that it may be appropriate to allow monetary damages for violation of constitutional rights where the legislature has fashioned no other adequate remedial scheme. *See Shields v. Gerhart* (Vt. 1995), 658 A.2d 924, 934.

¶40    In *Widgeon v. Eastern Shore Hosp. Center* (Md. 1984), 479 A.2d 921, the Maryland Court of Appeals considered whether the plaintiff could recover damages for the violation of his state rights to due process and to be free from unreasonable searches and seizures. The court gave little consideration to the Vermont Supreme Court's two-part analysis but did consider significant that state's constitutional provision for application of the common law of England. It noted that:

> Under the common law of England, where individual rights, such as those now protected by Article 26 [to be free from unreasonable searches and seizures], were preserved by a fundamental document (*e.g.*, the Magna Carta), a violation of those rights generally could be remedied by a traditional action for damages. The violation of the constitutional right was viewed as a trespass, giving rise to a trespass action.

*Widgeon*, 479 A.2d at 924.

16

¶41 Based on the historical precedent established by the English Common Law and the Maryland court's consideration of the U.S. Supreme Court's decision in *Bivens*, that court held that when a person is deprived of the constitutional rights at issue in that case, those rights may be enforced by bringing a common law action for damages. *Widgeon*, 479 A.2d at 929. In response to the defendant's contention that because plaintiff had available to him remedies under state tort law, a cause of action for violation of constitutional rights should not be recognized, the Maryland court stated:

> It is a well-settled rule, however, that where a particular set of facts gives rise to alternative causes of action, they may be brought together in one declaration, and where several remedies are requested, an election is not required prior to final judgment. Additionally, under some circumstances, a state constitutional provision may recognize and preserve an interest that is wholly unprotected under state common law and statutes. Thus, the existence of other available remedies, or a lack thereof, is not a persuasive basis for resolution of the issue before us. [Citations omitted.]

*Widgeon*, 479 A.2d at 928-29.

¶42 In *Moresi v. Department of Wildlife & Fisheries* (La. 1990), 567 So.2d 1081, the Supreme Court of Louisiana concluded that the plaintiff in that case could bring a cause of action for damages for violation of his state constitutional right to privacy and to be free from unreasonable searches and seizures. That court based its decision on *Bivens* and the previously cited English Common Law. Courts in Utah and New York, following the two-part analysis employed in Vermont, have concluded the state constitutional rights in those states to be free from cruel and unusual punishment, equal protection and the right to be free from unreasonable searches and seizures are self-executing and that based on the English

17

Common Law and *Bivens*, damages for violations of those state constitutional rights are recoverable. *See Bott v. DeLand* (Utah 1996), 922 P.2d 732, *limited by Spackman ex rel. Spackman v. Board of Educ.* (Utah 2000), 16 P.3d 533; *Brown v. State* (N.Y. 1996), 674 N.E.2d 1129.

¶43     More recently, the State of Connecticut has arrived at the same conclusion based on *Bivens* and the Restatement. *See Binette v. Sabo* (Conn. 1998), 710 A.2d 688. The Connecticut decision provides an excellent summary of how other states had resolved this issue by 1998. *See Binette*, 710 A.2d at 696-97. The Connecticut court also distinguished constitutional torts from common law torts such as assault, trespass or conversion. It stated:

> The difference in the nature of the harm arising from a beating administered by a police officer or from an officer's unconstitutional invasion of a person's home, on the one hand, and an assault or trespass committed against one private citizen by another, on the other hand, stems from the fundamental difference in the nature of the two sets of relationships. A private citizen generally is obliged only to respect the privacy rights of others and, therefore, to refrain from engaging in assaultive conduct or from intruding, uninvited, into another's residence. A police officer's legal obligation, however, extends far beyond that of his or her fellow citizens: the officer not only is required to respect the rights of other citizens, but is sworn to *protect and defend* those rights. In order to discharge that considerable responsibility, he or she is vested with extraordinary authority. Consequently, when a law enforcement officer, acting with the apparent imprimatur of the state, not only fails to protect a citizen's rights but affirmatively *violates* those rights, it is manifest that such an abuse of authority, with its concomitant breach of trust, is likely to have a different, and even more harmful, emotional and psychological effect on the aggrieved citizen than that resulting from the tortious conduct of a private citizen.

*Binette*, 710 A.2d at 698.

18

¶44     We conclude that the *Bivens* line of authority buttressed by § 874A of the Restatement (Second) of Torts are sound reasons for applying a cause of action for money damages for violations of those self-executing provisions of the Montana Constitution. We also conclude that those rights protected by Article II, Sections 10, 11 and 17 of the Montana Constitution are self-executing based on the same analysis employed by the Supreme Court of Vermont in *Shields*. We conclude that this result is further compelled by our own statutory law and, in particular, §§ 1-1-109 and 27-1-202, MCA. Section 1-1-109, MCA, provides that:

> The common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States or the constitution or laws of this state, is the rule of decision in all the courts of this state.

Section 27-1-202, MCA, provides that:

> Every person who suffers detriment from the unlawful act or omission of another may recover from the person in fault a compensation therefor in money, which is called damages.

¶45     Either statute standing alone reinforces our decision based on the legislative policy of this state. However, when considered together, and with the right found at Article II, Section 16 of the Montana Constitution to a remedy for every injury, this body of statutory and constitutional law permits no other result.

¶46     The Defendant and Amicus Curia, Montana Defense Trial Lawyers Association, urge that already available common law tort remedies such as conversion and trespass are adequate remedies for the conduct alleged by the Plaintiffs and, therefore, a cause of action for violation of the Montana Constitution should not be authorized. However, we agree with the previous authorities that there is a great distinction between wrongs committed by one

19

private individual against another and wrongs committed under authority of the state. Common law causes of action intended to regulate relationships among and between individuals are not adequate to redress the type of damage caused by the invasion of constitutional rights.

¶47 Finally, Defendants claim that this issue has been resolved in *Irving v. School Dist. No. 1-1A* (1991), 248 Mont. 460, 813 P.2d 417. However, *Irving* is clearly distinguishable. There, we held as a matter of law that there was no damage from a school board's violation of Montana's open meeting law found at Article II, Section 9 of the Montana Constitution because the Legislature had provided a remedy pursuant to § 2-3-213, MCA, which would have voided action taken at a closed meeting and no effort had been made by the plaintiff to do so. *Irving*, 248 Mont. at 465, 813 P.2d at 420. We held that plaintiff's damages did not arise from closure of the meeting but from action taken at the meeting which could have been invalidated. *Irving*, 248 Mont. at 465, 813 P.2d at 420. Any additional language about the constitutional claim being duplicative of a claim made pursuant to 42 U.S.C. § 1983 was unnecessary to the decision and was merely dicta.

¶48 For these reasons, we conclude that the District Court correctly held that a cause of action for money damages is available for violation of those rights guaranteed by Article II, Sections 10 and 11 of the Montana Constitution. In addition, we conclude that a direct cause of action for money damages is available for violation of the Plaintiffs' rights guaranteed by Article II, Section 17 of the Montana Constitution, and remand for further consideration of the Plaintiffs' claims for damages pursuant to all three sections of Article II.

20

¶49   Did the Defendants have statutory immunity based on the facts in this case pursuant to § 2-9-103(1), MCA?

¶50   Section 2-9-103(1), MCA, provides as follows:

> If an officer, agent, or employee of a governmental entity acts in good faith, without malice or corruption, <u>and</u> under the authority of law <u>and</u> that law is subsequently declared invalid as in conflict with the constitution of Montana or the constitution of the United States, neither he nor any other officer or employee of the governmental entity he represents nor the governmental entity he represents is civilly liable in any action in which he, such other officer, or such governmental entity would not have been liable had the law been valid. [Emphasis added.]

¶51   The District Court held that because Ames and Caraway acted in reliance on the law (citing *Ramsey v. Burns* (1902), 27 Mont. 154, 69 P. 711, and *Boyd v. United States* (1886), 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746) and because neither acted with "malice or corruption," all Defendants were entitled to immunity as a matter of law pursuant to § 2-9-103(1), MCA. The problem with the District Court's analysis is twofold. First, Caraway and Ames, based on their own testimony, did not rely on anything they assumed to be true based on *Ramsey* or *Boyd*. They relied on the writ of execution and on Dorwart's admonishment to use the back door and not let the cat out. Second, we did not conclude that postjudgment execution statutes were unconstitutional for authorizing entry into Dorwart's home. We held that there was nothing in the writ of execution or the statutes pursuant to which they were issued which did authorize entry into Dorwart's home. Neither was there any language in the

writ of execution nor in the execution statutes which authorized seizure of nonexempt property owned by Dorwart or others. We specifically stated:

> Here, neither the writs of execution themselves, nor the post-judgment execution statutes pursuant to which the writs were issued, expressly directed or authorized the deputies to enter Dorwart's private residence to effectuate the seizure of his property.
>
> . . . .
>
> Moreover, nothing in the post-judgment execution statutes expressly authorizes the entry into a private home for the purposes of executing a writ of execution. While the execution statutes authorize the levy on–or "seizure" of–a judgment debtor's personal property pursuant to a writ of execution, they do not authorize officials to enter private homes to search for that property. [Citations omitted.]

*Dorwart I*, ¶¶ 33, 48.

¶52 Therefore, Caraway and Ames did not enter Dorwart's home and seize nonexempt property pursuant to a statute which has since been held unconstitutional. The execution statute pursuant to which they entered the home did not authorize their entry in the first place and did not authorize their seizure of nonexempt property. For these reasons, we conclude that § 2-9-103(1), MCA, is inapplicable to their conduct and they were not provided with statutory immunity. However, we also conclude that to the extent any claim for damages for violation of Dorwart's right to due process is based on a failure to provide him with the notice of exempt property and a timely hearing required by our prior decision, those claims are a result of the execution statutes' constitutional inadequacy and recovery for those procedural inadequacies is barred by the statutory immunity provided by § 2-9-103(1), MCA. The

District Court's dismissal of the Plaintiffs' claims based on statutory immunity is otherwise reversed.

## ISSUE 3

¶53 Should this Court create qualified immunity analogous to federal qualified immunity as applied in claims pursuant to 42 U.S.C. § 1983, and, if so, were Defendants in this case entitled to summary judgment on that basis?

¶54 Damages may be recovered for violation of federal constitutional rights pursuant to 42 U.S.C. § 1983. That section provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

¶55 However, in *Harlow*, the Supreme Court held that qualified or good faith immunity is sometimes necessary to balance the competing values of damages for violation of a constitutional right and the vigorous exercise of official authority. The Court held that:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. [Citations omitted.]

*Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

¶56 We applied qualified immunity to bar the Plaintiffs' claims based on § 1983 in *Dorwart I*. There we held that the law on which Dorwart relied in asserting his federal claim

23

was not clearly established at the time that it was violated. Caraway and Ames were entitled to qualified immunity for Dorwart's § 1983 search and seizure claim. *Dorwart I*, ¶ 112.

¶57 Defendants contend that they are also entitled to qualified immunity from liability for violation of the Plaintiffs' state constitutional rights. They contend that other state courts have so held and cite as examples *Moressi*; *Jenness v. Nickerson* (Me. 1994), 637 A.2d 1152; *Duarte v. Healy* (Mass. 1989), 537 N.E.2d 1230; and numerous federal decisions. Defendants and Amicus Curia, Montana Defense Trial Lawyers Association, contend that the same policy considerations which justify the application of qualified immunity to damage claims for violation of federal constitutional rights should apply to claims for violation of state constitutional rights and that because the issue of qualified immunity has been previously determined in the Defendants' favor, they are entitled to have the District Court's summary judgment affirmed.

¶58 Dorwarts contend that this Court should decline to follow the federal law regarding qualified immunity because it would lead to a procedural quagmire, reward ignorance of constitutional rights and detract from efficiency in resolving constitutional claims.

¶59 In amicus briefs filed by Wade Dahood, Chairman of the Bill of Rights Committee of the 1972 Montana Constitutional Convention, and the Montana Trial Lawyers Association, Amici contend that the adoption of qualified immunity in Montana would ignore fundamental differences between federal law and our state constitution. They contend that the federal government has reserved sovereign immunity except to the extent that it is waived, citing *United States v. Mitchell* (1980), 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607,

24

but that the Montana Constitution abolishes sovereign immunity except to the extent that it is readopted by two-thirds of the Legislature, citing Article II, Section 18 of the Montana Constitution. They contend that federal qualified immunity is a common law construct arising from the long tradition of sovereign immunity as recognized by the Supreme Court in *Richardson v. McKnight* (1997), 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540.

¶60   Although most state courts which have considered the issue have followed the federal law of qualified immunity, not all have done so. In *Clea v. City of Baltimore* (Md. 1988), 541 A.2d 1303, 1314, the Maryland Court of Appeals rejected qualified immunity as a defense to violations of the Maryland Constitution with the following explanation:

> On the other hand, constitutional provisions like Articles 24 or 26 of the Maryland Declaration of Rights, or Article III, § 40, of the Maryland Constitution, are specifically designed to protect citizens against certain types of unlawful acts by government officials. To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the purpose of the constitutional provisions. It would also, as frankly recognized by counsel for Officer Leonard in this Court, largely render nugatory the cause of action for violation of constitutional rights recognized in *Widgeon, Mason, Heinze, Weyler,* and other cases.

¶61   While we agree with the Maryland Court of Appeals, we find more compelling the historical basis for federal immunity and our own constitutional provisions which eliminate governmental immunity and protect access to our courts.

¶62   In *Mitchell*, 445 U.S. at 538, 100 S.Ct. at 1351, the Supreme Court stated that:

> It is elementary that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed."

In the absence of clear congressional consent, then, "there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States." [Citations omitted.]

¶63    The Supreme Court has also explained the difference between qualified immunity and a defense to a claim on the merits as well as the deeply rooted common law traditions for immunity at a federal level in *Richardson*. In *Richardson*, the Court was presented with the question of whether qualified immunity could be applied to bar claims by Tennessee prisoners who claimed to have been injured by guards at a private prison. The Court held that prison guards employed by a private firm are not entitled to a qualified immunity from suit by prisoners charging a § 1983 violation. *Richardson*, 521 U.S. at 412, 117 S.Ct. at 2108.

¶64    In *Richardson*, 521 U.S. at 403, 117 S.Ct. at 2103, the Court explained that "a distinction exists between an 'immunity from suit' and other kinds of legal defenses. . . . [A] legal defense may well involve 'the essence of the wrong,' while an immunity frees one who enjoys it from a lawsuit whether or not he acted wrongly." It concluded that while immunity for a government employee is deeply rooted in the common law there is no comparable tradition of immunity applicable to privately employed prison guards.

¶65    Likewise, there is no comparable immunity found in Montana for the acts of state employees in violation of state constitutional rights. In fact, contrary to the federal presumption of immunity, the Montana State Constitution at Article II, Section 18, prohibits immunity in the following language:

26

The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a two-third vote of each house of the legislature.

¶66 We need not decide in this case whether by a two-thirds vote of the Legislature qualified immunity can in fact be created which would render unenforceable other provisions of the same constitution. The Legislature clearly has not done so and that argument is not before us.

¶67 Furthermore, Article II, Section 16 of the Montana Constitution provides that "[c]ourts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character."

¶68 As pointed out in *Richardson*, qualified immunity is not a defense to the merits of a claim but frees a wrongdoer from liability whether or not he or she acted wrongly. Therefore, the adoption of qualified immunity in Montana would also be inconsistent with the constitutional requirement that courts of justice afford a speedy remedy for those claims recognized by law for injury of person, property or character.

¶69 For these reasons, we conclude that qualified immunity, as established by federal law and applied by this Court in *Dorwart I*, to bar those claims filed by plaintiffs pursuant to 42 U.S.C. § 1983 is not applicable to those claims filed by the Plaintiffs for violation of those rights guaranteed by the Montana State Constitution.

¶70 Did the District Court err when it denied Plaintiffs' claim for an award of attorney's fees?

¶71 Dorwarts contend that the violation of their state constitutional rights entitled them to an award of attorney's fees in addition to whatever damages might be proven and recoverable. In support of that argument, Plaintiffs contend that attorney's fees are recoverable in successful claims pursuant to 42 U.S.C. § 1983 and that fees are necessarily recoverable for vindication of state constitutional rights by analogy and because the cost of bringing a claim might otherwise outweigh the expected benefits. Prior to oral argument, Plaintiffs did not claim nor brief their entitlement to attorney's fees pursuant to the private attorney general theory which we adopted in *School Trust v. State ex rel. Bd. of Com'rs*, 1999 MT 263, ¶ 67, 296 Mont. 402, ¶ 67, 989 P.2d 800, ¶ 67. Therefore, we will not consider Plaintiffs' claim for attorney's fees on that basis.

¶72 The Defendants contend that an award of attorney's fees under the circumstances in this case would be unjust for the reasons set forth in *Dorwart I*. Amicus Curia, Montana Defense Trial Lawyers Association, contends that it is a legislative responsibility to determine when fees are recoverable and it has not created a right for the recovery under the circumstances in this case.

¶73 The District Court concluded that:

> The general rule in Montana is that "the prevailing party in a civil action may not recover attorney's fees absent a contractual agreement or express statutory authority." *Parker v. Elder* (1992), 254 Mont. 270, 271, 836 P.2d 1236, which cited *Harris v. Bauer* (1988), 230 Mont. 207, 749 P.2d 1068,

and *Martin v. Crown Life Insurance Co.* (1983), 202 Mont. 461, 658 P.2d 1099. There is no contractual agreement providing for attorney's fees in this case. Plaintiff has not cited any statute providing for attorney's fees.

¶74 The District Court was correct. Based on the issue as it has been framed by the parties' arguments and the authorities presented to us, we conclude that no authority has been established for an award of attorney's fees to the Plaintiffs in this case. Therefore, we affirm the District Court's denial of Plaintiffs' claim for attorney's fees.

## SUMMARY

¶75 We conclude that the rights at issue in this case, Article II, Sections 10, 11, and 17 of the Montana Constitution, are self-executing and that pursuant to the English Common Law as adopted by the State of Montana, § 874A of the Restatement (Second) of Torts, and analogous federal law, including *Bivens*, in combination with the clear intent of those delegates to the Montana Constitution that courts be open for redress of injuries to person, property, or character, that a claim for damages from violation of the specified state constitutional rights can be presented as a cause of action in Montana. We furthermore conclude that § 2-9-103(1), MCA, is not a defense to the Plaintiffs' claims based on the facts in this case and make no determination about its constitutionality. We conclude that qualified immunity as described by the U.S. Supreme Court in *Harlow* is not a defense to claims for damages for violation of Montana constitutional rights. And, finally, we conclude that based on the arguments and authorities presented in this case, the Plaintiffs are not entitled to the recovery of attorney's fees.

¶76 The right to privacy–to be left alone–is precious. It is essential to our quality of life. No one was more aware of that than the authors of our Constitution who went to great and conspicuous lengths to preserve it in the face of what they correctly anticipated would be increasing political pressure and the developing technological ability to erode it.

¶77 Invasion of individual privacy by a fellow citizen is a bad thing. Invasion by the state or its agents is worse. A culture of governmental disregard for the right to privacy would be worst of all. To avoid that possibility in the face of sometimes short-sighted popular and political sentiment will take a vigilant judiciary with a full arsenal of remedies. Today, in recognition of this year's thirtieth anniversary of our state constitution and those far-sighted delegates who crafted it, we add the cause of action for damages to that arsenal.

¶78 For these reasons, we affirm in part and reverse in part the District Court's order of summary judgment.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

30

Justice James C. Nelson specially concurs.

¶79  I concur in our Opinion. Before discussing the substance of my special concurrence, however, I am compelled to address Chief Justice Gray's contention that our Opinion--and presumably my special concurrence--violate the "law of the case" doctrine as regards our discussion and holding on due process. I agree that the law of the case doctrine is an important rule; it is axiomatic that we have applied it many times. Notwithstanding, this doctrine is not applicable in the present situation given the posture of this case vis-a-vis *Dorwart I.* First the law.

¶80  In her dissent, Chief Justice Gray relies on *Calcaterra v. Montana Resources*, 2001 MT 193, ¶ 9, 306 Mont. 249, ¶ 9, 32 P.3d 764, ¶ 9, for the proposition that under the law of the case doctrine, an earlier decision by this Court resolving a particular issue between the same parties in the same case is binding and cannot be relitigated. However, *Calcaterra* also stated that "the doctrine of law of the case is not inviolable and that there may be exceptions to the application of the doctrine." *Calcaterra,* ¶ 12 (citing *State v. Gilder*, 2001 MT 121, ¶ 13, 305 Mont. 362, ¶ 13, 28 P.3d 488, ¶ 13). We set forth one such exception in *State v. Zimmerman* (1977), 175 Mont. 179, 185, 573 P.2d 174, 178, wherein we noted that

> an exception to this general rule [of the law of the case] exists where the case must be remanded to the District Court for further proceedings because of reversal on an unrelated issue. In such case this Court may correct a manifest error in its former opinion and announce a different ruling to be applied prospectively to future proceedings in the case. This exception to the general rule is recognized in Montana at least since 1955 when we held that the law of the case announced in the first appeal, and which governed the second trial, does not prevent the appellate court from correcting a manifest error in its

address it in *Dorwart I*. Thus, that issue was never decided. The law of the case doctrine, therefore, does not apply.

¶83  With that said, I turn to my separate Opinion. Our resolution of this cause using *Bivens v. Six Unknown Named Agents* (1971), 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, and the common law as components of the analytical construct for our decision is appropriate given the manner in which the arguments on appeal were framed by the parties and given the present state of the law.

¶84  Nonetheless, for reasons hereinafter discussed, I firmly believe that, *independent* of any federal jurisprudence, federal constitutional authority, the common law, or other authority, the foundation for private causes of action for damages for constitutional violations is found in the language of Montana's 1972 Constitution and in the proceedings of the Constitutional Convention. I suggest that it is important to acknowledge this principle, because the greater guarantees of individual rights afforded by Montana's Constitution may be neither bounded nor frustrated by federal court decisions which, with seeming increasing frequency, are weakening similar protections of the federal constitution. *See Trankel v. Department of Military Affairs* (1997), 282 Mont. 348, 362, 938 P.2d 614, 623 (holding that the sentence in Article II, Section 16, Constitution of Montana, that guarantees an employee the right of full legal redress against third parties is mandatory and self executing and "leaves no room for erosion based on what federal courts or the courts of other states would do pursuant to federal laws or the laws of other states.").

33

¶85 Moreover, Montana's Constitution guarantees rights that are not provided for in the federal constitution--the right to a clean and healthful environment, the right to pursue life's basic necessities, the right to enjoy and defend one's life and liberties (all protected under Article II, Section 3); the right of dignity (Article II, Section 4); the right of public participation in the operation of governmental agency decision making (Article II, Section 8); the right to examine government documents and to observe the deliberations of government entities (Article II, Section 9); the right of individual privacy (Article II, Section 10); the rights of persons not adults (Article II, Section 15); the right of access to the courts and to full legal redress (Article II, Section 16); the waiver of sovereign immunity (Article II, Section 18); rights regarding the initiation of criminal proceedings, criminal detention, imprisonment for debt and rights of the convicted (Article II, Sections 20, 23, 27 and 28 respectively); the right to an award of attorney fees in eminent domain cases (Article II, Section 29); and others.

¶86 In point of fact, Professors Larry Elison and Fritz Snyder state that seventeen of Montana's Declaration of Rights have no parallel in the Bill of Rights of the U.S. Constitution. LARRY M. ELISON AND FRITZ SNYDER, THE MONTANA STATE CONSTITUTION: A REFERENCE GUIDE, 20 (2001) (hereinafter ELISON) (citing Ronald K. L. Collins, *Reliance on State Constitutions--The Montana Disaster*, 63 TEX. L. REV. 1095, 1122 (1985)). Thus, it is important that the right of direct action to protect these distinctive Montana constitutional rights not be restricted by jurisprudence that is limited to a few constitutional

rights that are common to both the constitutions of the United States and Montana or that were historically actionable at common law.

¶87 As stated in *Dorwart I*, the constitutional rights violated in the case at bar were those guaranteeing the right to be free from unreasonable searches and seizures under the Fourth Amendment and Article II, Sections 10 and 11 of Montana's Constitution and the right to due process of law protected by the Fourteenth Amendment and Article II, Section 17. At least as the federal law now stands, *Bivens* and the line of cases following it support our decision here to create a remedy for the violations of these rights.

¶88 In *Bivens*, the United States Supreme Court, recognizing for the first time an implied private remedy for a constitutional tort, held that the victim of a Fourth Amendment violation by federal officers may bring suit for money damages against the officers in federal court. *Bivens*, 403 U.S. at 396-97, 91 S.Ct. at 2004-05. As stated in our Opinion, in the decade following, the Court extended *Bivens* to include an implied damages remedy for violation of the Fifth Amendment Due Process Clause (*Davis v. Passman* (1979), 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846) and for violation of the guarantee against cruel and unusual punishment under the Eighth Amendment (*Carlson v. Green* (1980), 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15).

¶89 However, since *Carlson*, the Supreme Court has consistently refused to extend *Bivens* to cover violations of any new constitutional torts or any new category of defendants. *Correctional Serv. Corp. v. Malesko* (2001), 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456.

In *Correctional Services* the Court refused to extend *Bivens* to authorize a right of action for damages against a private entity (there a private prison operated under contract to the federal Bureau of Prisons), even though the corporation was acting under color of federal law. *Correctional Services*, 534 U.S. at ___, 122 S.Ct. at 519. The Court made it clear that *Bivens* is to deter individual federal officers from committing constitutional violations and that the Court created and twice extended the otherwise nonexistent cause of action only to provide a remedy for a plaintiff "who lacked *any alternative remedy* for harms caused by an individual officer's unconstitutional conduct." *Correctional Serv.*, 534 U.S. at ___, 122 S.Ct. at 521 (emphasis in original).

¶90 Even that, in my estimation, overstates the present Court's view of *Bivens*. One cannot read *Correctional Services* and the cases cited therein[1] without coming away with the conclusion that *Bivens* is and will be limited to violations of constitutional rights under the Fourth and Eighth Amendments and in some cases under the Fifth Amendment (Due Process Clause). And, even in those instances, the Court will likely carefully scrutinize the

---

[1] *See Bush v. Lucas* (1983), 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (Court declined to create a *Bivens* remedy for First Amendment violation); *Chappell v. Wallace* (1983), 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (Court declined to allow enlisted military personnel a *Bivens*-type remedy against their superior officers); *United States v. Stanley* (1987), 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (no *Bivens* remedy available for injuries that arise out of military activity "incident to service"); *Schweiker v. Chilicky* (1988), 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (Court declined to infer damages action against individual government employees alleged to have violated due process in handling of Social Security claims); *FDIC v. Meyer* (1994), 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (Court declined to extend *Bivens* to permit suit against federal agency, even though the agency was amenable to suit because Congress had waived sovereign immunity).

circumstances of each case and, if it applies *Bivens* at all, it will do so as narrowly as possible. The Court is, and, at least as presently constituted, will be very reticent to expand *Bivens* to other constitutional guarantees or to other classes of defendants.

¶91 Indeed, in his concurring opinion, Justice Scalia, joined by Justice Thomas, stated that he would *not* extend *Bivens* even if the narrowest rationale of that case arose in a new context. Not mincing words, Justice Scalia relegated *Bivens* to the status of "a relic of the heady days in which [the] Court assumed common-law powers to create causes of action-- decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition." *Correctional Serv.*, 534 U.S. at ___, 122 S.Ct. at 523-24 (Scalia, J., concurring).

¶92 Given this direction of the U.S. Supreme Court, *Bivens* eventually may well be interpreted out of any meaningful existence. Moreover, as noted, *Bivens* is already limited to constitutional torts committed by governmental officers under color of law; involving searches and seizures, cruel and unusual punishment or some due process violations; and where the injured person lacks an alternative remedy. These limitations make it analytically difficult to provide citizens with the broader and, in some cases, unique, protections afforded by Montana's Constitution should a case arise in some other context; involve some other class of defendant or injured plaintiff; involve a constitutional right not historically actionable under common law; involve a right where the common law remedy has been superseded or suspended by statute; or involve a right for which the statutory remedy created is inadequate.

¶93 Therefore, I believe that it is important to address an equally compelling rationale for our decision to recognize that there is a direct, private right of action for state constitutional violations. This alternate rationale is derived from the language of Montana's Constitution, independent of federal jurisprudence and federal constitutional authority; independent of the common law; and independent of statute. It is to that, I now turn.

¶94 In his *amicus curiae* brief, Wade Dahood, Esq., formerly the Chairman of the Bill of Rights Committee (Committee) at the Constitutional Convention, argues persuasively that when the Constitution's "Declaration of Rights was framed, [the Committee] intended it to stand on its own footing and to provide individuals with fundamental rights and protections far broader than those available through the federal system." This statement is supported by reference to the Committee's February 22, 1972 transmittal letter to the Convention delegates which states that "new safeguards" had been added to the Declaration [Bill] of Rights "to meet the changing circumstances of contemporary life" and that:

> In presenting this proposed Declaration of Rights, the committee notes that the guidelines and protections for the exercise of liberty in a free society come *not from government but from the people who create that government.*

> It is that spirit which has motivated this committee to insure for Montana's future, through this bill of rights, a more responsible government that is Constitutionally commanded never to forget that *government is created solely for the welfare of the people* so that the people can more fully enjoy the heritage of American liberty within the structure of that government.

*Montana Constitutional Convention, Bill of Rights Committee Proposal*, Vol. II, 619 (emphasis added).

38

¶95 Taking these admonitions to heart, this Court has, for example, applied the broader protections of Montana's Constitution in a number of contexts involving individual privacy (*Gryczan v. State* (1997), 283 Mont. 433, 942 P.2d 112) and personal autonomy (*Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364); involving search and seizure (*State v. Bullock* (1995), 272 Mont. 361, 901 P.2d 61; *State v. Siegal* (1997), 281 Mont. 250, 934 P.2d 176; *State v. Elison*, 2000 MT 288, 302 Mont. 228, 14 P.3d 456); involving the environment (*Montana Envtl. Info. Ctr. v. Department of Envtl. Quality*, 1999 MT 248, 296 Mont. 207, 988 P.2d 1236); and involving the right of participation and the right to know (*Common Cause v. Statutory Comm. to Nominate Candidates for Comm'r of Political Practices* (1994), 263 Mont. 324, 868 P.2d 604; *Great Falls Tribune Co. v. Great Falls Pub. Schs.* (1992), 255 Mont. 125, 841 P.2d 502; *Associated Press v. Board of Pub. Educ.* (1991), 246 Mont. 386, 804 P.2d 376; *Jarussi v. Board of Trustees* (1983), 204 Mont. 131, 664 P.2d 316).

¶96 Furthermore, and acknowledging the Committee's statement that no part of the Constitution is more important, *Montana Constitutional Convention*, Vol. II, 619, we have repeatedly recognized the rights found in Montana's Declaration of Rights as being "fundamental," *Butte Community Union v. Lewis* (1986), 219 Mont. 426, 430, 712 P.2d 1309, 1311, meaning that these rights are significant components of liberty, any infringement of which will trigger the highest level of scrutiny, and, thus, the highest level of protection by the courts. *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 52, 310 Mont. 123, ¶ 52, 54

P.3d 1, ¶ 52 (Nelson, J., concurring).

¶97     We have also observed the obvious logical corollary to these rules: "[c]onstitutional rights that cannot be enforced are illusory. It is as if those rights cease to exist as legal rights." *Kloss*, ¶ 58 (Nelson, J., concurring). The importance of being able to enforce one's constitutional rights through the courts and to receive meaningful redress for public or private injury cannot be overstated. If an individual's constitutional rights can be violated by the government, by the government's officers, or, where so protected, by a private person, secure in the knowledge nothing will come of the wrongdoing, then it follows that the constitution provides no protection at all. It is but a collection of elegant words without substance; it is a shield made of little more than aspirations and hopes.

¶98     As Attorney Dahood argues in his *amicus* brief, in order to avoid this result and in order to give Montana's constitutional guarantees teeth, the framers intended that the people retain the ability to protect their rights--both enumerated and unenumerated--through direct actions in the courts. This conclusion follows from the Committee's proposal of Article II, Section 34 to the Convention delegates and the subsequent adoption of this provision. Article II, Section 34 states:

> **Unenumerated rights.** The enumeration in this constitution of certain rights shall not be construed to deny, impair, or disparage others retained by the people.

¶99     In proposing the adoption of this Section,[2] the Committee did two things. First, it

---

[2] This provision was formerly included as Article III, Section 30 of the 1889 Constitution of Montana.

40

recognized that the rights enumerated in Montana's Constitution were not exclusive--i.e. that there are unenumerated rights or "rights beyond those specifically listed" which are retained by the people. *Montana Constitutional Convention*, Vol II., 645. Second, and important for our purposes here, the Committee considered this Section to be " . . . a crucial part of any effort to revitalize the state government's approach to civil liberties questions . . . [and that this Section] . . . may be the source of innovative judicial activity in the civil liberties field." *Montana Constitutional Convention*, Vol II., 645.

¶100 The proceedings of the Constitutional Convention reveal no debate on Article II, Section 34. It was adopted unanimously on the straightforward, yet eloquent recommendation of Delegate Eck, who stated: "I think that [this Section] is completely self-explanatory. There are rights which are not enumerated which the people of Montana should not be denied." *Montana Constitutional Convention, Verbatim Transcript,* Vol VI, 1832.

¶101 Professors Elison and Snyder observe that the Committee's belief that Article II, Section 34 could be the source of "innovative judicial activity" in the area of civil liberties has not been realized; that there are no cases referencing or interpreting this Section. ELISON, 86. While technically inaccurate that no cases have referenced this Section,[3] it is true that this Court has not applied Article II, Section 34 in any substantive context.

---

[3] Article II, Section 34, was mentioned in *Mountain States Tel. & Tel. Co. v. Department of Pub. Serv. Regulation* (1981), 194 Mont. 277, 282, 634 P.2d 181, 184; in *Associated Press, Inc. v. Department of Revenue*, 2000 MT 160, ¶ 62, 300 Mont. 233, ¶ 62, 4 P.3d 5, ¶ 62 (Nelson, J., concurring); and in *Harper v. Greely* (1988), 234 Mont. 259, 262, 763 P.2d 650, 652 (citing to Mr. Justice Sheehy's reference to the Section in his concurring opinion in *Butte Community Union*, 219 Mont. at 435; 712 P.2d at 1314).

41

¶102   Professors Elison and Fritz suggest that:

> [t]he section could be used as the basis for the introduction of a theory of natural law or an expansion of the use of substantive due process or judicial finding of unstated individual rights hidden in the self-reliant, free-thinking, idiosyncratic Montanan mythology.  Presumptively, this could limit state police power and enlarge existing rights or create new rights. . . .  While plenary state legislative power and unenumerated rights might appear to be in conflict or contradictory, they are not.  In a state constitution a provision on unenumerated rights as a balance against state police power is a potentially useful idea, but something of an anomaly.  Historically, within the context of state governments in a federal system, the limitations on plenary legislative power are the specific prohibitions and restrictions found in a constitutional declaration of rights.  *Adding unenumerated rights to specific prohibitions and restrictions could transfer to the people indirectly, and to the courts directly, additional means of checking plenary legislative power.*

ELISON, 87 (emphasis added).

¶103   Frankly, I can think of no better application of Article II, Section 34 than in the case at bar.

¶104   As the Committee recognized, the "protections for the exercise of liberty in a free society come *not from government but from the people who create that government* [and that] *government is created solely for the welfare of the people.*"  *Montana Constitutional Convention*, Vol, II, 619 (emphasis added).  Indeed, Article II, Section 1 of the Constitution of Montana could not be more clear:

> *All* political power is vested in and derived from the people.  *All* government of right originates with the people, is found upon *their* will *only,* and is instituted *solely* for the good of the whole.

(Emphasis added).

¶105   The intent of the framers and the language of the Constitution is incontrovertible:  all

42

government is derived from and originates with the people; government is created and instituted solely for the good and welfare of the people. Thus, and with those core principles in mind, it makes perfect sense that, as they did in Article II, Section 34, the people would retain unto themselves rights beyond those which are enumerated in their Constitution. Recognizing that they are the wellspring of all government which they choose to impose upon themselves, the people also positively declared their intent not to restrict their liberties to those textually set out in their Constitution.

¶106 Correspondingly, it takes no leap of logic to conclude that one of the unenumerated rights which the people would necessarily retain is the power--the right, if you will--to protect from government infringement their ability to fully exercise those liberties which they specifically guaranteed unto themselves in their Declaration of Rights.

¶107 As already noted, constitutional rights that cannot be enforced are illusory; they simply cease to exist; they offer no protection whatsoever. Therefore, it follows that to ensure that the government which they created did not, like Frankenstein's monster, turn on its creator, the people would, as they did, implicitly retain the right to directly access the courts to protect and enforce their other constitutional liberties.

¶108 Among others, the people guaranteed unto themselves fundamental rights to due process of law, to be free from unreasonable searches and seizures, to individual privacy and to access and redress in their courts. The best--and more likely, the only--protection that the people could reserve unto themselves to make sure that the government, its agents, and in

43

some cases, their fellow citizens did not outright violate or inexorably chip away at these rights, was to also guarantee their right to sue directly for these sorts of violations.

¶109 Indeed, if the people had not necessarily retained this right, then there is nothing to stop the government from disparaging the peoples' constitutional liberties and then fixing that impairment by prohibiting or limiting the people from seeking relief and redress in the courts. The government would no longer derive from and originate with the people; rather, government would originate with the government. The people would no longer have the power to enforce and protect their constitutional liberties; rather, they would be dependent upon the government for that protection and with that, whatever limitations, restrictions and impairments the government chose to impose on that protection. In short, without retaining the right of direct action for constitutional violations, the core premise under which the people adopted their Constitution--that government derives from and originates with them-- would, itself, be meaningless, because it could not be enforced.

¶110 For these reasons, I would hold that the people have reserved unto themselves under Article II, Section 34 of the Constitution of Montana, the unenumerated right to sue their government, its agents, and, in some cases, their fellow citizens, directly in the courts of this state for violations of their fundamental rights protected under Montana's Constitution.

¶111 Moreover, I would hold that this unenumerated right of direct action for damages for constitutional violations is a stand-alone right guaranteed by Article II, Section 34, independent of the enumerated rights of access to the courts and to full legal redress

guaranteed by Article II, Section 16 and independent of the right to defend one's life and liberties guaranteed by Article II, Section 3. Indeed, Article II, Section 34 unambiguously makes this distinction in providing that the enumeration of certain rights in the constitution "shall not be construed to deny, impair or disparage others retained by the people."

¶112 In my view, the real efficacy of this Article II, Section 34 cause of action is to ensure that the enumerated fundamental rights *are* protected from diminution, limitation and restriction. This stand-alone right of direct action for constitutional violations would protect the most basic and most important rights that Montanans enjoy. These are the rights that:

> shield . . . each individual from the excesses of government, from the tyranny of the majority, and from the sorts of abuses perpetrated by persons, firms, corporations, associations, organizations, and institutions that, in pursuit of their own interests and agenda, effectively would deprive the people of those things essential to their humanity and to their lawful individual pursuits.

*Associated Press*, ¶ 55 (Nelson, J., concurring).

¶113 Returning to Attorney Dahood's *amicus* brief, he states:

> In placing Article II, Sec. 34 in the 1972 Constitution, the framers wanted to make clear that it was "crucial" that the judiciary had the power to recognize unenumerated rights when necessary to protect and secure those which are enumerated. A direct cause of action to protect the specified rights is one of those "unenumerated rights."

I could not agree more.

¶114 I concur in our Opinion. I also believe that Montana's Constitution contains within it's own provisions a heretofore untapped source of authority--Article II, Section 34-- guaranteeing to the people, by their own reservation, an unenumerated, yet fundamental, right

45

of direct action for constitutional violations.

_____
                                      Justice

Justice Terry N. Trieweiler concurs in the foregoing special concurrence.

_____
                                        Justice

Justice W. William Leaphart, specially concurring.

¶115 A number of the briefs filed in this appeal, noting that the deputies testified that they were "commanded by the judge" to go seize the property, expressed a concern that officers should be protected in the performance of their duties when they are acting in reliance on a court order. I write separately to address that concern and point out that the parties did not specifically raise, and thus the Court does not address, the question of quasi-judicial immunity, which is separate and distinct from qualified immunity. In doing so, however, I do not express an opinion as to whether the doctrine of quasi-judicial immunity would change the result in this case.

¶116 Under our 1972 Constitution, the government is not immune from suit unless the legislature enacts a statute by a two-thirds vote of each house. Art. II, Sec. 18, Mont. Const. Pursuant to that provision, the legislature enacted § 2-9-112, MCA, which provides as follows:

> **Immunity from suit for judicial acts or omissions.** (1) The state and other governmental units are immune from suit for acts or omissions of the judiciary.
> (2) A member, officer, or agent of the judiciary is immune from suit for damages arising from his lawful discharge of an official duty associated with judicial actions of the court.
> (3) The judiciary includes those courts established in accordance with Article VII of The Constitution of the State of Montana.

¶117 We addressed the question of quasi-judicial immunity in *Reisdorff v. County of Yellowstone*, 1999 MT 280, 296 Mont. 525, 989 P.2d 850. Complaints of animal cruelty had been lodged against Reisdorff. She filed a suit for damages claiming that the county had

searched her property without her permission. Reisdorff contended that when the Yellowstone County animal control officers searched her property and removed her animals, they were not entitled to immunity because they were not agents of the judiciary involved in an official duty. The animal control officers argued that they acted pursuant to the justice of the peace's orders and were thus entitled to immunity. We concluded that the animal control officers, after asking for and receiving permission to seize the animals, were "directly implementing the justice court order to: 'Take what steps it deems necessary to bring the defendant into compliance.'" *Reisdorff*, ¶ 30.

¶118 We then explained that the doctrine of quasi-judicial immunity arises from the doctrine of judicial immunity:

> "Quasi-Judicial Immunity is more limited than the immunity afforded Judges and extends only to those acts committed within the scope of the actor's jurisdiction and with the authorization of law. The Doctrine is not for the benefit of a defendant-actor but rather for the benefit of the public whose interest it is that quasi-judicial officers should be at liberty to exercise their functions unfettered by fear of legal consequences."

*Reisdorff*, ¶ 35, quoting *Turner v. American Bar Ass'n* (N.D. Texas 1975), 407 F.Supp. 451, 482.

¶119 The federal circuit courts have explained the policy considerations behind quasi-judicial immunity. "The fearless and unhesitating execution of court orders is essential if the court's authority and ability to function are to remain uncompromised." *Coverdell v. Dept. of Social & Health Services* (9th Cir. 1987), 834 F.2d 758, 765. Police officers "must not be required to act as pseudo-appellate courts scrutinizing the orders of judges." *Valdez v. City*

48

*and County of Denver* (10th Cir. 1989), 878 F.2d 1285, 1289. Rather, "the public interest demands strict adherence to judicial decrees." Id.

¶120 As to officers who rely and act upon a judge's order, there is nothing in this opinion which abrogates the doctrine of quasi-judicial immunity. As we concluded in *Reisdorff,* "[c]ourts have consistently held that officials acting pursuant to a facially valid court order have a quasi-judicial absolute immunity from damages for actions taken to execute that order." *Reisdorff,* ¶ 35 (citation omitted).

_____W. William Leaphart_____
Justice

Justice Terry N. Trieweiler concurring.

¶121 Frankly, I do not understand the point of Justice Leaphart's concurring opinion and write separately to caution the parties and the District Court from attaching too much significance to it. To do so would only lead to further error, expense and delay before finally resolving this decade-long dispute on the merits.

¶122 First, Justice Leaphart points out that the parties have not raised quasi-judicial immunity. Then he claims he has no opinion about its application. One would assume that would be the end of the discussion. However, as if the facts in this case cry out for some defense, he then proceeds to brief that issue for the parties and tout the policy considerations behind it.

¶123 Having read the entire record, including the testimony of the Defendants, I can assure the parties that, Justice Leaphart's unsolicited coaching aside, there is no factual nor legal basis for the application of quasi-judicial immunity to this case. To test those waters would only lead to further error, further appeal and further delay. Considering the Defendants' representations at oral argument about the hardship that protraction of this case has caused them, that would not seem to be in anyone's best interests.

¶124 It is also necessary to respond to the dissent of Justice Rice. Justice Rice concludes that statutory immunity is applicable because Deputy Sheriffs Ames and Caraway acted under "authority of law" when they entered Dorwart's house. We, of course, have previously concluded that there was no statute, court order or prior decision of this Court which granted that authority. However, Justice Rice concludes that the combination of our 1902 decision

50

in *Ramsey v. Burns* (1902), 27 Mont. 154, 69 P. 711, and Justice of the Peace Marilyn Kober's command to "enter the residence" were the "authority of law" necessary to satisfy the statute. The problem with Justice Rice's analysis is threefold. First, neither Ames nor Caraway ever heard of *Ramsey*. Second, Judge Kober did not tell either officer to enter or search Dorwart's home. Third, *Ramsey* has not been "declared invalid as in conflict with the Constitution of Montana or the Constitution of the United States."

¶125 Justice Rice's opinion quotes at length from the testimony of Deputy Sheriff Paul Caraway. However, the quoted portion of Caraway's testimony is out of context and for purposes of statutory or quasi-judicial immunity, the most critical portion is omitted. When asked what authority he had to enter Dorwart's house, Caraway gave the following answer:

> A. I guess it would be two answers to that. The first would be an order from Judge Kober, and the second would be Mr. Dorwart's, the conversation with him that we had while downstairs in the Sheriff's Office to enter through the back door due to the fact that it wasn't locked, and to make sure that we used the back sliding, I believe it was a sliding glass door.

¶126 However, when referring to Judge Kober's "order," counsel for Dorwart clarified that what he was referring to were the writs of execution that had been issued. The following question and answer are in the record:

> Q. And when you say "order", do you mean by that the two Writs of Execution that you all were given?
>
> A. Yes, sir.
>
> Q. There was not any separate order?
>
> A. No, sir, there was--to my knowledge, there was two executions.

51

Q. You would agree with me, wouldn't you, that the writs do not state that you are to enter a residence and search it?

A. If you're looking for those specific words in the writ, I don't believe that was exactly specified in the writ itself.

¶127 The only conversation he recalled having with Justice of the Peace Kober was the one referred to by Justice Rice during which she told him to go to the house and take certain property. However, he did not testify that Justice of the Peace Kober advised him to enter and search the house. On the contrary, when asked the specific question, he gave the following answer:

Q. Did the subject of entering the house and searching it, was that specifically discussed with her?

A. With me, other than what I told you where she said go to the house and take the items–

Q. Okay.

A. –that was the extent of my conversation.

¶128 Furthermore, Caraway admitted that he knew the law prohibited entering a person's house without permission or a warrant or exigent circumstances and conceded that an oral conversation with a judge would not be sufficient to authorize entry into a home. He gave the following testimony:

Q. But you do agree with me that a court cannot orally authorize entry into a home, under any circumstances?

A. An oral conversation by itself, I don't believe would be enough.

52

¶129   Neither did Deputy Sheriff Danny Ames rely on a verbal order from Justice of the Peace Kober to enter Dorwart's house. He simply testified that he believed he was authorized to enter pursuant to the writ because the writ authorized him to seize property. However, he was aware that there was no express authorization in the writ to enter the house. His only other excuse for entering the house was his conversation with Dorwart. However, here is how he characterized that conversation:

Q. Do you remember what you said to him?

A. He was back in the jail, and I held up the writs, told him that I had them. I asked him if he had the money in order to pay the writs, I forget the amount, it was over $1000. He said he didn't. I told him that I was going to have to go to his residence and seize the property.

During the conversation, he told me to go ahead and use the back door because you didn't need a key to get in the back door.

Q. He said that after you told him you were going to have to go there to seize the property?

A. Told him we were going to have to seize some property.

Q. Did you tell him you were going to have to go in the house to seize some property?

A. I would imagine I did, because he told me that use the back door.

Q. Okay.

And you were holding up the writs when you said that?

A. Yes, I showed him the writs.

Q. Did you explain to him that you had to seize property because of these writs, or do you remember if you said anything about it?

53

A. I believe that's what I said, as if he didn't have the money, then I had the court orders, and that according to the court orders, if he couldn't pay for them, that I had to seize the property to be sold in order to justify–or pay the writs off.

Q. And then tell me again, as best you can remember, what he said back? I know you have answered this once, but I–

A. Sure. I don't know the entire conversation. I do know that it was, you know, use the back door, you don't need a key to get in the book [sic] door. Something was said about the side door being locked, and then also he said something about be careful, he had a cat in the residence at the time, make sure that we didn't let the cat out.

¶130 Ames conceded that he primarily inferred permission from Dorwart because when he told him he needed to go to his house and seize his property and had writs authorizing him to do so, he did not specifically object to him doing so.

¶131 Caraway admitted that he had no separate conversation with Dorwart and he admitted that neither he nor Ames asked Dorwart for permission or consent to enter the home and search it. He testified:

Q. Neither you or Danny asked Russ for his permission or consent to go in the home and search it; is that right?

A. Specifically, no.

Q. And it was at least implied to Russ that the Writ of Execution–that under the Writ of Execution, you all were going to go into the house and seize property, period?

A. Dan specifically told him we will have to execute this writ and seize property–

Q. Right.

A. –to satisfy this judgment.

54

¶132 As far as the conversation with Justice of the Peace Marilyn Kober, Danny Ames testified:

> Q. Before you and Paul went out to Russ' house on April 11th, '91, did you have, yourself have any conversations with Justice of the Peace Marilyn Kober about this?
>
> A. There was a conversation that went on, I believe it was between Sgt. Caraway, Paul Caraway and the judge, and I was there. I don't remember any of the conversation. I vaguely remember a conversation, but I couldn't tell you what the conversation was about.

¶133 Therefore, two people directly involved in the entry of and search of Dorwart's home have either testified that they were given no specific direction by Justice of the Peace Kober to enter and search the home or do not remember the conversation with Kober at all. This is hardly a basis for statutorily immunizing someone who violated a fundamental right under the constitutions of Montana and the United States.

¶134 Nor is the persistent effort to find shelter in *Ramsey* persuasive. When asked the following question, Caraway gave the following answer:

> Q. Prior to going into Russ Dorwart's home on April 11th, whatever it was, April of '91, had anyone told you that Montana law authorized entry into a home and search and seize property under a Writ of Execution?
>
> . . . .
>
> A. Specifically in those words, I can't—it's hard to answer yes or no. I know I had been told under Montana law that you have to follow the orders of a judge; that you're obligated to follow the orders of a judge.
>
> I guess when you word it like you worded it, the answer—I don't have an answer for that. I mean, I can't say specifically that they had told me that.

¶135 Ames testified as follows:

Q. And no one had ever said that the law in Montana allows you to do this, to go into a home under a Writ of Execution?

A. I guess I would–I would–I can't really say that anybody ever said those specific words.

¶136 In fact, Ames clearly testified that his reliance was only on the writ and what he inferred was Dorwart's permission to enter his house. He stated:

Q. Other than your position that you had consent and your belief that the writs themselves authorized you to go in the house, do you believe there was any other basis to go in the home and search it?

A. With those two that you just got done telling me, no.

¶137 All of this testimony brings us back to the original point made in the majority Opinion. There was no statute authorizing Caraway and Ames to enter Dorwart's home. There was no decisional law which allowed an invasion of his privacy pursuant to a writ of execution. The writ of execution itself did not authorize entry into and search of Dorwart's home and neither did anything that was said by Justice of the Peace Kober. Therefore, there simply was no basis for the application of statutory immunity.

¶138 It is clear from the entire context of the deputies' testimony that they have justified their entry into and search of Dorwart's home and seizure of his exempt property for two reasons. First, they contend the writs authorized them to do so. However, we have now held twice that they did not. Second, they contend that Dorwart gave them permission to enter and search his home. However, it is clear that he did not. He was never even asked for his permission.

¶139   To suggest that somewhere in this series of uninformed mistakes, there lies a defense such as quasi-judicial or statutory immunity is a disservice to the Defendants, those who are advocating on their behalf, and law enforcement in general who will surely repeat the Defendants' mistakes if encouraged to do so based on misinformation.

¶140   While none of the above is appropriately included in the official Opinion of the Court, I do conclude it was necessary to clarify the record and respond to the suggestions of Justices Leaphart and Rice.

_____
Justice

Chief Justice Karla M. Gray, dissenting.

¶141 I join the Court in holding that a cause of action for money damages is available in Montana for violations of the rights to privacy and to be free from unreasonable searches and seizures guaranteed by Article II, Sections 10 and 11 of the Montana Constitution. For the reasons discussed at some length below, I dissent from the Court's discussion of--and holding on--due process. I also dissent from the Court's holding that the defendants in this case are not entitled to statutory immunity pursuant to § 2-9-103(1), MCA, and, to that extent, join Justice Rice's dissent. I also join Justice Leaphart's thoughtful discussion of the doctrine of quasi-judicial immunity. Finally, because I would hold that the defendants have statutory immunity, I would not address the remaining issues resolved by the Court.

¶142 Regarding due process, the Court begins at ¶ 20 by stating that we "mistakenly omitted remanding [Dorwart's state constitutional right to due process claim] to the District Court for further consideration" in *Dorwart I.* As the author of *Dorwart I,* and notwithstanding the appellants' one conclusory statement in their opening brief that "the claims that remained at issue [on remand after *Dorwart I*] were Dorwart's claims of violations of the Montana Constitution's . . . right to not have his property taken without due process of law," the record does not support this proposition.

¶143 The record in this case relating to Dorwart's due process claims begins with the First Amended Complaint. Therein, the plaintiffs began by generally alleging a claim for money damages for violations of constitutional and common law rights, and a claim for declaratory

58

judgment and injunctive relief regarding whether the statutes at issue violated due process under both the federal and state constitutions. The plaintiffs then alleged, *inter alia*, three due process claims: 1) the Third Cause of Action alleged a violation by the defendants of the right to due process under the Montana Constitution, resulting injury and a request for monetary damages and fees; 2) the Ninth Cause of Action alleged a violation by the defendants of due process under the United States Constitution, resulting injury, and a request for compensatory and punitive damages; and 3) the Tenth Cause of Action sought declaratory and injunctive relief on due process grounds, alleging irreparable injury in support thereof. The District Court ultimately entered summary judgment for the defendants on all of plaintiffs' claims--expressly including the Third Cause of Action, the alleged violation by the defendants of the Montana constitutional right to due process--except the plaintiffs' claim for declaratory judgment and injunction.

¶144 In this latter regard, however, the District Court created some confusion by granting the plaintiffs partial summary judgment on the "ninth cause of action," expressing its ruling as a determination that the *statutes* at issue violate "state and federal due process" and enjoining the County from levying writs of execution against plaintiff Russell Edward Dorwart without appropriate notification. In other words, having first determined that the defendants were entitled to summary judgment on *all* claims except that for declaratory judgment and injunction, it then misstated the plaintiffs' Ninth Cause of Action as one alleging both federal and state due process violations, determined those violations to exist

59

via the unconstitutional statutes, and granted--as it stated it would--summary judgment to the plaintiffs on their request for injunctive relief, without characterizing it as the plaintiffs' Tenth Cause of Action.

¶145 The plaintiffs filed a notice of appeal from certain portions of the District Court's Memorandum and Order, including those portions granting the defendants'--and denying their--motion for summary judgment on their Third Cause of Action (state constitutional due process claim) and Ninth Cause of Action (federal constitutional due process claim). The defendants cross-appealed the District Court's grant of partial summary judgment to the plaintiffs on their declaratory and injunctive relief claims.

¶146 The plaintiffs' appellate follow-through, if any, regarding either the Third or Ninth Cause of Action was hardly a model of clarity. In the due process section of their brief on appeal--which exceeded 25 pages in length--they contended in 3½ pages that due process was violated even if the challenged statutes are constitutional (at best, a murky argument with regard to the Third Cause of Action). In that portion of their brief, the plaintiffs correctly noted that the District Court separated their due process claims in a manner not entirely consistent with the causes of action asserted, contended the separate due process claim that the defendants violated the statutes was "an alternative claim in the event the challenged statutes were found to be constitutional," and argued that the trial court's conclusion that their property was not taken in violation of due process was inconsistent with its conclusion that the statutes were unconstitutional. The plaintiffs then specifically stated as follows:

60

> It would appear that, if the statutes are unconstitutional, then Dorwart's property was taken in violation of due process, *and the claim of a due process violation based on violating those same statutes would be moot. In the event this Court does not find those statutes unconstitutional, then Dorwart asserts his due process claim that the statutes were violated.*

(Emphasis added.) The remainder of the plaintiffs' due process arguments during the first appeal consisted of a discussion and analysis captioned Due Process Was Violated Because the Challenged Statutes are Unconstitutional, running more than 20 pages in length, which argued in support of the District Court's conclusion that the statutes at issue were unconstitutional. Indeed, it ended by enumerating the various reasons the statutes violate due process and concluding that "[t]he district court's analysis and conclusion on this issue is correct." In other words, the plaintiffs' brief regarding due process was largely a pre-emptive strike against the anticipated cross-appeal argument that the trial court had erred in determining that the statutes were unconstitutional.

¶147 We stated the due process issue in *Dorwart I* as follows: "Did the District Court err in determining that Montana's post-judgment execution statutes are unconstitutional because they do not provide the procedural due process of law required by Article II, Section 17 of the Montana Constitution and the Fourteenth Amendment to the United States Constitution?" *Dorwart I,* ¶ 62. In our discussion, we followed both the trial court's and the plaintiffs' lead in addressing the constitutionality of the statutes, ultimately concluding that the statutes are unconstitutional because "they do not provide the procedural due process of law required by Article II, Section 17 of the Montana Constitution and the Fourteenth Amendment to the

61

United States Constitution." *See Dorwart I,* ¶¶ 63-103. Implicitly agreeing with the plaintiffs' argument that the due process question with regard to the officers' alleged violation of the statutes would be moot if we determined the statutes to be unconstitutional, we properly did not address that issue. In retrospect, our opinion could have been more clear. In any event, we held the statutes unconstitutional under the due process provisions of both the federal and state constitutions. Because we properly did not address whether--or conclude that--the officers had violated the statutes, we also properly did not remand for further consideration of a constitutional claim against the officers. The Court is simply wrong in concluding otherwise.

¶148    Moreover, in advancing its notion that we "mistakenly omitted remanding" on the due process claim against the defendants themselves, the Court fails to take into account both the availability of a Rule 34, M.R.App.P., petition for rehearing and the fact that the plaintiffs availed themselves of the opportunity to file such a petition after our decision in *Dorwart I* was issued. The first section of that petition argued that we had erroneously stated that they did not request monetary damages as part of their federal due process violation and tied the request for monetary damages for the federal due process violation to the issue of the defendants' entitlement to qualified immunity. It ended with the statement that "Dorwart's due process rights were clearly established and Ames and Caraway should not be entitled to qualified immunity." Nothing in that portion of the plaintiffs' petition for rehearing requested any change in the extent of our remand to the District Court on the due process issue.

¶149 The second section of the petition for rehearing did, however, request that the state law due process constitutional claim--that is, the plaintiffs' Third Cause of Action--be remanded to the District Court. After objections to the petition by the defendants, and responses *amici curiae*, we issued our order on November 12, 1998, withdrawing the original ¶ 103 from our August 4, 1998, Opinion, and replacing it with the ¶ 103 which now is part of the opinion in *Dorwart I* and which is discussed above. We denied the plaintiffs' petition for rehearing in all other respects, including the requested remand on the Third Cause of Action. Three of the members of our current Court, including myself, signed the order. Two others, including the author of the Court's opinion in this second appeal, noted on our order that they would deny the petition for rehearing outright. My point here, of course, is that the plaintiffs requested a remand of their state constitutional due process claim in their petition for rehearing in *Dorwart I,* and all members of the Court denied that request. In light of this record, it is beyond imagining how the Court can now state that we mistakenly omitted such a remand in the earlier appeal.

¶150 The record and logic aside, the law of the case doctrine clearly prohibits the Court's remand of the state constitutional due process claim at this point. Under that doctrine, an earlier decision by this Court resolving a particular issue between the same parties in the same case is binding and cannot be relitigated. *Calcaterra v. Montana Resources*, 2001 MT 193, ¶ 10, 306 Mont. 249, ¶ 10, 32 P.3d 764, ¶ 10 (citation omitted). We addressed the due process issues between these parties in *Dorwart I,* and even expressly rejected the remand

now determined to be appropriate by the Court. Quite clearly, the purpose of the law of the case doctrine--"to promote judicial economy and prevent the never-ending litigation of a single case"--and its long jurisprudential basis in Montana (*see Calcaterra*, ¶ 10) are no longer of interest to the Court. I would apply the doctrine and be done with the due process issues in this case which began more than 10 years ago.

¶151 Justice Nelson gamely attempts to defend the Court's failure to apply the law of the case doctrine here, but the defense falls far short. He quotes at length from *Zimmerman* in support of an exception to application of the doctrine where the court is correcting a "manifest error" in its former opinion. Justice Nelson then fails to apply the *Zimmerman* rationale to the present case.

¶152 As discussed at length above, there was no manifest error in our failure to remand on the plaintiffs' Third Cause of Action. Nor does the Court address the issue as correcting a manifest error. Indeed, the Court merely "decides"--some four years later--that we mistakenly failed to remand on the Article II, Section 17 claim.

¶153 Similarly, Justice Nelson's point that the law of the case doctrine is limited to issues actually decided is generally correct, but also of little help here. As discussed above, the plaintiffs asserted during the first appeal that the state constitutional due process cause of action would be moot if we upheld the District Court's conclusion that the statutes themselves were unconstitutional. We upheld that conclusion; to say that we "ignored" the issue is wholly inappropriate in light of the procedural and decisional record in this case and,

moreover, it allows the plaintiffs to entirely change their argument on the point during this second appeal. In addition, of course, we denied the plaintiffs' petition for rehearing which sought precisely the remand the Court has now decided was "mistakenly" omitted in *Dorwart I*. Thus, the issue of a remand regarding the Third Cause of Action has been "actually decided" and cannot properly be revisited now.

¶154 Finally, the Court also specifically concludes that "a direct cause of action for money damages is available for violation of the Plaintiffs' rights guaranteed by Article II, Section 17 of the Montana Constitution . . . ." The Court is again in error, for several reasons.

¶155 First, as discussed above, the due process issues in this case were resolved in *Dorwart I* on the District Court's conclusion that the statutes at issue were unconstitutional, this Court's affirmance of that conclusion and our denial of the request for remand in the plaintiffs' petition for rehearing. Second, the Court's conclusion that "a direct cause of action for money damages is available for violation of the Plaintiffs' rights guaranteed by Article II, Section 17 of the Montana Constitution" is not supported by the "self-executing" analysis it applies to the rights of privacy and to be free from unreasonable searches and seizures under the Montana Constitution. In other words, the Court has improperly--and only very indirectly--applied that analysis to the due process claim.

¶156 Let me be clear: I agree with the *Shields/Bivens* analysis the Court applies to the issue of the existence of a constitutional cause of action for violations of certain constitutional

65

rights. It is my view, however, that that analysis does not support a constitutional cause of action for a due process violation in the present case.

¶157 The only case to which the Court cites with regard to the ability to recover money damages for violations of the constitutional guarantee of due process--albeit under the Fifth Amendment--is the United States Supreme Court's decision in *Davis v. Passman. Davis,* however, was not a "pure" due process case under the "nor be deprived of life, liberty, or property, without due process of law" language of the U. S. Constitution, which is nearly identical to that in Article II, Section 17 of the Montana Constitution. Rather, *Davis* involved a gender-based discrimination claim brought pursuant to the Fifth Amendment's right to due process by a Congressional staffer against the legislator for whom she had worked. The Supreme Court relied on its cases interpreting the Due Process Clause as including an *equal protection* component, and allowed the cause of action to proceed. *Davis,* 442 U.S. at 234, 99 S.Ct. at 1471. Thus, *Davis* is not at all analogous to the present case, and does not support the Court's conclusion here.

¶158 Moreover, the Court's reliance on *Shields* is more notable for what it does not disclose about that case than for what it does. I agree entirely with the Court's statement that *Shields* "held that a general provision guaranteeing a right to enjoy life was *not* self-executing but that the specific guarantee of a right to free speech *was* self-executing." (Emphasis added.) The statement itself clearly invites the question of what distinguishes a self-executing from

66

a non-self-executing constitutional provision, a question the Court ignores but *Shields* addresses.

¶159   The *Shields* court begins by quoting as follows from the United States Supreme Court decision in *Davis v. Burke*, a case relied on by most jurisdictions in determining whether a state constitutional provision is self-executing:

> A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, . . . and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law . . . .
>
> . . . In short, *if complete in itself, it executes itself.*

*Shields*, 658 A.2d at 928 (quoting *Davis v. Burke*, 179 U.S. at 403, 21 S.Ct. at 212 (citations omitted)).  The *Shields* court went on to state that

> [d]etermining whether a provision supplies a sufficient rule entails application of certain relevant criteria, no one of which is dispositive.  First, a self-executing provision should do more than express only general principles; it may describe the right in detail, including the means for its enjoyment and protection.

*Shields*, 658 A.2d at 928.  The court then proceeded to apply those, and other, principles in determining that the Vermont constitutional provision guaranteeing a right to enjoy life is not, as the Court properly observes in the present case, self-executing, but that the constitutional right to freedom of speech is self-executing.  *Shields*, 658 A.2d at 928-30.

¶160   The Court performs no *Shields* analysis here with regard to the constitutional due process cause of action, and I submit that such an analysis would produce a result opposite

from that the Court reaches. In other words, the Article II, Section 17 due process right clearly is not self-executing for purposes of supporting a constitutional cause of action for money damages.

¶161 Moreover, our cases standing for the proposition that due process is a flexible concept which should be tailored to the circumstances of each case are legion. *See, e.g., State v. Hagen*, 2002 MT 190, ¶ 13, 311 Mont. 117, ¶ 13, 53 P.3d 885, ¶ 13; *In re B.P.*, 2001 MT 219, ¶ 31, 306 Mont. 430, ¶ 31, 35 P.3d 291, ¶ 31; *McDermott v. McDonald*, 2001 MT 89, ¶ 10, 305 Mont. 166, ¶ 10, 24 P.3d 200, ¶ 10; *Pickens v. Shelton-Thompson*, 2000 MT 131, ¶ 15, 300 Mont. 16, ¶ 15, 3 P.3d 603, ¶ 15; *Jellison v. Mahoney*, 1999 MT 217, ¶ 8, 295 Mont. 540, ¶ 8, 986 P.2d 1089, ¶ 8; *Smith v. Board of Horse Racing*, 1998 MT 91, ¶ 11, 288 Mont. 249, ¶ 11, 956 P.2d 752, ¶ 11. In light of both *Shields* and our cases, it is inconceivable to me that a private constitutional due process cause of action can exist which, among other things, would improperly permit a jury to determine the constitutional and ever-flexible question of what process is due.

¶162 I understand the Court's desire to breathe life into the provisions of the Montana Constitution. Where that desire properly can be pursued under the law, I support it. For all the reasons stated herein, I cannot support any portion of the Court's analysis of the due process issue. I dissent.

Chief Justice

68

Justice Jim Rice, concurring in part and dissenting in part.

¶163 I concur with this Court's decision on Issue 1, that Article II, Sections 10 and 11 of the Montana Constitution are self-executing, and provide the basis for a right of action for damages for violation thereof. Regarding the Article II, Section 17 claim, I join Chief Justice Gray's dissent. I respectfully dissent from this Court's determination on Issue 2 that the Defendants are not entitled to statutory immunity pursuant to § 2-9-103(1), MCA. Based on the plain language and plain meaning of the statute, I would affirm the District Court's conclusion that the Defendants are entitled to immunity thereunder and, therefore, would not address Issue 3 or Issue 4.

¶164 Section 2-9-103(1), MCA, declares:

> If an officer, agent, or employee of a governmental entity acts in good faith, without malice or corruption, and under the authority of law and that law is subsequently declared invalid as in conflict with the constitution of Montana or the constitution of the United States, neither he nor any other officer or employee of the governmental entity he represents nor the governmental entity he represents is civilly liable in any action in which he, such other officer, or such governmental entity would not have been liable had the law been valid.

¶165 First, to be entitled to immunity, the officers must act in good faith and without malice or corruption. In considering the statute, the Court does not address the officers' intent or motivation. The record reveals that Officers Ames and Caraway, upon receiving the writs of execution, and prior to serving them, conferred with Judge Kober in order to clarify their duties, and received instructions from her. Thereafter, they also spoke with Dorwart himself, and received instructions from him regarding entry into his home. The District Court found,

69

as we did in *Dorwart I*, that the officers "were acting on a reasonable, good faith understanding of the law," and, applying the statutory definitions of "corruptly" and "malice," found that neither officer "had a 'wrongful design to acquire or cause some pecuniary or other advantage' to themselves by their actions, nor did they 'wish to vex, annoy, or injure' Dorwart by their actions." I conclude the District Court's findings are correct, and that the statute's requirement that the officers act in good faith, without malice or corruption, was satisfied.

¶166 Second, the statute requires that the officers must act "under authority of law." Dorwart and *amicus* Montana Trial Lawyers Association argue that there was no statute, court order or court decision which granted Defendants authority to enter Dorwart's home, and therefore, Defendants were not acting under authority of law. Dorwart challenges the District Court's reliance on *Ramsey v. Burns* (1902), 27 Mont. 154, 69 P. 711, in concluding that then-existing law supported the actions of Ames and Caraway.

¶167 At the times in question here, *Ramsey* was the only Montana case interpreting the scope and authority derived from a writ directing a levy on property. In executing a writ of attachment in *Ramsey*, the officer entered Ramsey's business and levied upon her personal property, remaining in possession of the business for five days. Ramsey subsequently sued the officer and, after a jury verdict against him, the officer appealed a jury instruction which stated that an officer with a writ of attachment "has not any right or authority to take and hold possession of any building in which the personal property to be seized is, and that he and his

70

bondsmen are liable in damages 'if he takes possession of such room or premises.'" *Ramsey*,
27 Mont. at 156, 69 P. at 712.

¶168   This Court determined the instruction to be error, stating:

> An officer has the right to enter a business place against the will of the
> occupant, permission having been asked and refused, and to seize the property
> therein belonging to the occupant and subject to levy . . . . The officer has a
> right to enter and have possession of the place . . . for a reasonable time, and
> he may have there the goods in storage for such reasonable time as he may
> require to pack them and to procure the necessary transportation for their
> removal.

*Ramsey*, 27 Mont. at 156-57, 69 P. at 712.  *Ramsey* had never been overruled and was the

state of the law at the time deputies Ames and Caraway entered Dorwart's residence in 1991

to execute on the writs of execution.

¶169   Although *Ramsey* did not squarely address the constitutional search and seizure issue

relating to a writ of execution or the scope and authority of a writ in the context of levying

personal property at a person's residence, this Court stated in *Dorwart I*, that "[w]hile

*Ramsey* did not address or resolve whether such an entry would survive constitutional

scrutiny, it certainly appeared to authorize an official acting pursuant to a writ directing the

levy on a person's property to enter and take possession of the premises in which property

subject to execution was located in order to effectuate the execution without the necessity of

a warrant." *Dorwart I*, ¶ 109.  We further concluded that "the deputies entered Dorwart's

home to execute the writs of execution according to procedures which appeared to be

appropriate under then-existing Montana law . . . ." *Dorwart I*, ¶ 126.

71

¶170 Following this Court's lead, the District Court determined that *Ramsey* remained a potential source "of authority on which to base a conclusion that Ames and Caraway did not violate Dorwart's rights when they entered his home." The District Court determined that the "then-existing law supported the actions of Ames and Caraway in the manner that they executed the writs of execution. . . . As required by § 2-9-103(1), MCA, the deputies were acting under authority of law."

¶171 The majority faults the District Court's determination that Ames and Caraway acted upon lawful authority because the testimony of Ames and Caraway does not demonstrate that either specifically knew of *Ramsey*, but that the officers merely "relied upon the writ of execution and Dorwart's admonishment to use the back door and not let the cat out."

¶172 It must first be noted that, in addition to the writs and the conversation with Dorwart, the deputies also relied upon an order from Judge Kober to seize the property to satisfy the writs:

> Q: [by Mr. Thomas]: [W]hat, in your mind at the time, was your authority for entering the home and searching it?
>
> A: [by Mr. Caraway]: I guess it would be two answers to that. The first would be an order from Judge Kober, and the second would be Mr. Dorwart's, the conversation with him that we had while downstairs in the Sheriff's Office to enter through the back door due to the fact that it wasn't locked . . . .
>
> Q: Any other basis besides those two?
>
> A: Just my obligation as a deputy to follow the orders of the judge and of my department.

Q: Were there any conversations between you or Danny Ames or Sheriff Brophy, for that matter, with Marilyn Kober before going out to Russ Dorwart's home to serve the writs?

A: Yes, there was.

Q: Can you remember how long before actually going out to his house that conversation was?

A: No, I don't. I know that we did have the papers to serve, and there was a question about what were we supposed to do. The papers were - they were unique to me . . . . And it appeared to me that Dan had some questions about it too. We came up, and we spoke to Marilyn [Kober] here in her office. And the papers stated to seize property . . . . I know I asked her, you know, what does this mean, what does this go and seize property to satisfy this monetary amount, what does this mean. She said to me, you go to his house; you take guns, stereos, whatever is there you think will satisfy this monetary amount.

Q: Would it be correct to say that at least at the time these writs were served, and the entry and search was made of Russ Dorwart's home, the primary concern of the Sheriff's Department was to try to seize enough property to satisfy the writs, and not whether Russ Dorwart had any rights that might be violated by doing this?

A: I would think that you would be incorrect in that assumption. I think that's why we had the conversation with the judge, was to make sure that we were doing things as the law allowed us to do . . . . I think otherwise, we would have went up and served the papers without any question or any conversation. I think we were concerned that we were legally doing things.

Q: I gathered from this case that you believed that the Writs of Execution authorized you to enter into Dorwart's residence and search for property and seize property to satisfy the writs; is that correct?

A: [by Mr. Ames]: Right.

¶173 The deputies, wanting to be certain that the writs themselves granted authority for them to enter Dorwart's premises and seize his property, personally requested verification

73

from Judge Kober and were commanded by Judge Kober ("you go to his house; you take [his property]") to enter the residence and seize Dorwart's property on the basis of the writ's authority.

¶174 But more significantly, the Court improperly faults the deputies' inability to cite to Montana case law. The immunity statute does not require that Ames or Caraway be able to cite to a 1902 Montana case that gave them authority to enter the premises in order to obtain immunity. The statute requires only that the officers "act . . . under the authority of law." Thus, if they acted under the authority of law, that portion of the immunity statute, by its plain meaning, is satisfied. The District Court was correct when it agreed with this Court's conclusions in *Dorwart I* that *Ramsey* appeared to authorize the deputies' actions at a time when "it certainly was not clear . . . that their actions violated Dorwart's search and seizure rights and right to privacy" and that the officers' actions "appeared to be appropriate under then-existing Montana law." Because *Ramsey* was the current state of the law in 1991 when the deputies executed the writ of execution, the deputies acted "under authority of law," thus satisfying the second element under § 2-9-103(1), MCA.

¶175 The third requirement for immunity under § 2-9-103(1), MCA, is that the law must subsequently be declared invalid as in conflict with the Constitution of Montana or the Constitution of the United States. The majority again faults the District Court because this Court in *Dorwart I* did not declare that the postjudgment execution statutes were unconstitutional for authorizing entry into Dorwart's home. However, such a finding is not

74

necessary in order to conclude that the deputies *are* entitled to immunity under § 2-9-103(1), MCA. The statute merely requires that the law that had provided authority for the deputies' actions be subsequently declared invalid as in conflict with either the Montana Constitution or the United States Constitution.

¶176   While the Court in *Dorwart I* did not declare either *Ramsey* or the postjudgment execution statutes unconstitutional, the unmistakable result of the adoption of the procedural requirement of an execution warrant in *Dorwart I* is that *Ramsey* can no longer be a valid, potential source of authority for an official acting pursuant to a writ of execution to enter a person's property or take possession of the premises in which property subject to execution is located, and to effectuate the execution without the necessity of a warrant. Thus, although this Court did not explicitly declare *Ramsey* invalid or unconstitutional, *Ramsey* is no longer valid, as it was in 1991, when it provided authority for officers to enter and levy upon a judgment debtor's personal property.

¶177   Under the plain language of § 2-9-103(1), MCA, the deputies must act under authority of law which subsequently must be "declared *invalid* as in conflict with the constitution of Montana or the constitution of the United States." In adopting the execution warrant requirement as a procedural safeguard, this Court in *Dorwart I* implicitly declared that *Ramsey* was no longer a valid source of authority for Ames' and Caraway's actions.

¶178 Based on the foregoing, I would conclude that the statutory requirements have been clearly met and that Ames and Caraway are entitled to statutory immunity pursuant to § 2-9-103(1), MCA, and would affirm the District Court's holding.

¶179 In sum, I conclude that, after its substantial and able review of the issues raised herein, the District Court correctly ruled that a right of action exists for the constitutional violations at issue here, but that the officers under these circumstances were shielded from the claim by statutory immunity.

Justice

76