IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 217

No. 99-443

295 Mont. 540

986 P.2d 1089

_____

GREGORY J. JELLISON, )

)

Petitioner, )

)

v. ) O P I N I O N

) AND

MIKE MAHONEY, Warden, ) O R D E R

Montana State Prison, )

)

Respondent. )

_____

¶1 Gregory J. Jellison (Jellison) petitions this Court for writ of *habeas corpus*. The State of Montana (the State) has filed a response opposing Jellison's petition.

Factual and Procedural Background

¶2 On July 3, 1998, 122 inmates at the Montana State Prison participated in a sit-down demonstration in the High Security yard of the prison, adjacent to the high security gymnasium. When the demonstration began at 2:30 p.m., Jellison was exercising in the gymnasium. Although other inmates in the gymnasium approached prison guards and requested and were permitted to exit out the back door so as to avoid becoming involved in the inmate demonstration, Jellison failed to show concern over participating in the demonstration or request that he be permitted to exit via the back door. Jellison exited the main door of the gymnasium and participated in the demonstration. During the course of the demonstration, Jellison repeatedly disobeyed correctional officers' direct orders to return to his cell and also made numerous demands that administrators repeal several new policies instituted within the prison. Jellison remained at the demonstration area until 10:00 p.m.

¶3 All of the 122 inmates who participated in the demonstration were provided with disciplinary notices and scheduled for hearings. Prison staff served Jellison with a Notice dated July 3, 1999, which stated that prison officials had decided to take disciplinary action against Jellison for numerous violations of prison rules during the demonstration. The Notice also informed Jellison that a hearing would be held on July 8, 1999, and that Jellison would be permitted to "present evidence and witnesses" on his behalf. Jellison signed the Notice upon receipt. Due to the number of scheduled hearings, staff constraints, and an emergency lock-down on July 8, 1999, Jellison's disciplinary hearing was continued until a later date.

¶4 Upon completion of a majority of disciplinary hearings following the demonstration, Unit managers were instructed to begin classification determinations for those inmates who had participated in the demonstration. On or about July 24, 1999, prison staff performed a re-classification of Jellison and recommended placement in administrative segregation. However, prison staff mistakenly believed that Jellison's disciplinary hearing had already been held. When presented with his re-classification order to review and sign, Jellison refused to comply. Jellison appealed his classification to prison authorities. His appeal was granted because prison authorities discovered that Jellison's re-classification by Unit staff had been based on erroneous information. Thus, prison staff immediately

withdrew Jellison's re-classification upon discovering the mistake.

¶5 Jellison's hearing was rescheduled to July 14, 1999, but was continued because Jellison requested witness statements from specified individuals. On July 28, 1999, Jellison's disciplinary hearing was held. Jellison claimed in defense that he was not a willing participant in the demonstration. However, the hearings officer had failed to obtain statements from some of Jellison's witnesses and refused to postpone the hearing again to obtain such statements. Based on the evidence before him, which included an infraction report, investigative findings, and incident reports, the hearings officer issued a written Decision finding Jellison guilty of participating in the demonstration and violating prison rules. Jellison was disciplined with a total of 35 days detention.

¶6 On August 6, 1999, prison staff completed a Reclassification Instrument and Classification Summary of Jellison and assigned him to Administrative Segregation with a recommendation that Jellison be reviewed in 90 days with a view towards maximum custody placement. Jellison petitions from the Decision and his custody re-classification.

Discussion

¶7 In essence, Jellison requests relief on two grounds: (1) due process; and (2) cruel and unusual punishment. He argues that due process was violated because the premature re-classification of his custody status prior to his disciplinary hearing rendered that proceeding fundamentally unfair, and because the hearing officer's failure to secure all requested witnesses resulted in the denial of exculpatory evidence.

¶8 Due process is a flexible concept, as this Court has repeatedly recognized, and, therefore, the process due an individual varies according to the factual circumstances and the nature of the right at stake. Sage v. Gamble (1996), 279 Mont. 459, 464-65, 929 P.2d 822, 825. As the State emphasizes, when considering the due process rights of inmates, it is exceedingly important to remember that prison disciplinary actions "takes place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." Wolff v. McDonnell (1974), 418 U.S. 539, 561, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935, 954. The liberty interest of a duly convicted inmate is, therefore, minimal indeed.

¶9 As the United States Supreme Court has recently pronounced, the liberty interest of an inmate "will be generally limited to freedom from restraint which, while not exceeding the

sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner (1995), 515 U. S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418, 430. As examples of forms of restraint which would implicate the due process rights of an inmate, the U.S. Supreme Court cited admission to a mental hospital and involuntary admission of psychotropic drugs. See Sandin, 515 U.S. at 484, 115 S.Ct. at 2300, 132 L.Ed.2d at 430. However, discipline in segregated confinement, while "concededly punitive" in nature, does not generally rise to the level of an "atypical, significant deprivation in which a State might conceivably create a liberty interest." Sandin, 515 U.S. at 485-86, 115 S.Ct. at 2301, 132 L. Ed.2d at 431. Nor does custody classification generally implicate a liberty interest sufficient to give rise to due process protection for an inmate. See Meachum v. Fano (1976), 427 U.S. 215, 224-25, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451, 458-59.

¶10 Here, Jellison was given written notice of his alleged infractions of prison rules, granted a hearing at which he was permitted to present evidence and witnesses, made a statement on his own behalf and presented a defense at the hearing, and provided with a written decision by the hearings officer outlining the basis for the decision. This was more than sufficient to satisfy the due process rights of an inmate. While Jellison claims that the hearing was rendered unfair by virtue of the premature re-classification of his custody status, which he suggests amounted to a predetermination of his guilt, there is no evidence in the record that the mistake in classification rendered the subsequent hearing fundamentally unfair. Indeed, Jellison's erroneous re-classification was immediately withdrawn by prison officials upon discovering the mistake and then performed anew after the disciplinary hearing was completed and Jellison found guilty. There is no indication that the premature re-classification "tainted" the disciplinary hearing, as Jellison claims.

¶11 Concerning Jellison's claim that he was denied the right to present exculpatory witnesses, we note that prison hearings officers are "required," per internal prison operating rules, "to collect the witness statements" whenever "the inmate is in temporary lock-up." In this case, it appears that the hearings officer failed to get specific witness statements that Jellison had requested while he was in temporary lock-up. Although statements were obtained from some of Jellison's proposed witnesses, we do not countenance the apparent failure of prison authorities to follow their own internal rules. Jellison alleges that statements from other inmates would have been exculpatory because they would have shown that he did not want to take part in the demonstration. However, Jellison provides this Court with no basis for believing that the specific witnesses would

have presented exculpatory testimony. He does not identify whether the witnesses were in a position to have observed Jellison being forced to participate in the demonstration, nor does Jellison identify what the substance of their testimony would be. Without more, this Court determines that there is no merit to Jellison's claim. Based on the record before us, it is clear that Jellison was presented with an opportunity to not participate in the demonstration, by exiting out the back door of the gymnasium, but chose to instead exit out the main door and join in the demonstration. In short, there is no evidence that Jellison was forced to participate.

¶12 Jellison also argues that he was subjected to cruel and unusual punishment, in violation of Article II, Section 22 of the Montana Constitution and the Eighth Amendment to the United States Constitution, due to the fact that prison officials were aware that inmates were planning a demonstration sometime in July of 1999. Jellison claims, in particular, that the hearings officer who presided over his disciplinary hearing failed to attempt to stop the demonstration, thereby exhibiting "deliberate indifference" which resulted in Jellison becoming unwillingly involved in the demonstration. However, as the State points out, the type of "deliberate indifference" which violates the Cruel and Unusual Punishments Clause is "obduracy and wantonness, not inadvertence or error in good faith . . . ." Whitley v. Albers (1986), 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251, 260-61. Thus, prison officials are accorded " 'wide ranging deference' " in adopting and executing policies to preserve internal order and discipline among the inmates, including "prophylactic and preventative measures intended to reduce the incidence" of breaches of prison order. See Whitley, 475 U.S. at 321-22, 106 S.Ct. at 1085, 89 L.Ed.2d at 262.

¶13 Here, the State indicates that, while the hearings officer was aware of rumors of a prison demonstration, he knew nothing about the specific details relative to the time, place, or the participants of the planned demonstration. Thus, we cannot conclude, given the wide ranging deference which we must accord prison officials to adopt policies and take preventative actions, that the hearings officer's mere awareness of rumors demonstrates "obduracy and wantonness" in violation of the Cruel and Unusual Punishments Clause. More importantly, we agree with the State that the record shows Jellison ultimately chose to participate in the prison demonstration, and was not forced to do so. Therefore,

¶14 IT IS ORDERED that Jellison's petition for writ of *habeas corpus* is DENIED.

¶15 The Clerk is directed to provide copies of this order to Petitioner personally and to counsel of record for the State.

¶16 DATED this 14th day of September, 1999.


/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER