IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 76

GARY QUIGG, et al.,

      Plaintiffs and Appellants,

   v.                               No. 05-692

BILL SLAUGHTER, Director, MONTANA
DEPARTMENT OF CORRECTIONS, et al.,

      Defendants and Respondents.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ANTHEL L. BROWN,

      Petitioner and Appellant,

   v.                             No. DA 06-0013

DEPARTMENT OF CORRECTIONS,

      Respondent and Respondent.

APPEALS FROM:   The District Court of the First  Judicial District,
                     In and For the County of Lewis and Clark, Cause CDV-02-174
                     and CDV-2004-172,
                     Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Edmund F. Sheehy, Jr., Cannon & Sheehy, Helena, Montana

            Anthel L. Brown, pro se, Shelby, Montana

      For Respondents:

            Valerie D. Wilson, Special Assistant Attorney General, Helena, Montana

                                Submitted on Briefs:  August 16, 2006
                                      Decided:   March 20, 2007

Filed:

                                _____
                                       Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Gary L. Quigg and sixty-four other plaintiffs (hereinafter Inmates) appeal an order of the First Judicial District Court, Lewis and Clark County, granting summary judgment to the defendants, officials of Montana Department of Corrections (hereinafter DOC or officials) on the Inmates' claims for injunctive and declaratory relief.  Likewise, Anthel Brown (Brown) appeals an order of the District Court also granting summary judgment to the officials on Brown's claims for injunctive and declaratory relief.  We entered an order on February 15, 2006, consolidating these cases for purposes of appeal.  We affirm.

¶2     We address the following issues on appeal:

¶3     1.  Did the District Court err in granting DOC's motion for summary judgment in Quigg, et. al. v. DOC?

¶4     2.  Did the District Court err in granting DOC's motion for summary judgment in Brown v. DOC?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶5     Prior to 1995, Montana State Prison at Deer Lodge (MSP) was the sole state correctional facility authorized by the State of Montana to house adult male criminal offenders.  Indeed, the State had no other such facility.  In 1995, responding to overcrowding at MSP, the Montana Legislature authorized the State to contract with local governments for the housing of male criminal offenders sentenced to MSP.  Then, in 1997, the Legislature authorized the State to contract with private prison facilities to house Montana inmates through the Regional Correctional Facility Act in Title 53,

2

Chapter 30, Part 5, MCA, and the Private Correctional Facility Act in Title 53, Chapter 30, Part 6, MCA.

¶6 To manage the adult offender population, DOC places secure custody inmates in the custody of MSP, the regional prisons in Cascade County and Dawson County, and the Crossroads Correctional Center, a private prison facility in Shelby. The following factual representations about these facilities have been offered as evidence in this litigation and not contested.

¶7 MSP offers the following mental health programs and services: mental health orientation, topical behaviors, dialectic behavior therapy, individual counseling, and inpatient mental health treatment. The regional and private prisons offer treatment opportunities for chemical dependency, alcoholics anonymous, parenting, cognitive principles, and anger management. Cascade County also provides emergency mental health services twenty-four hours per day, and services by a licensed and/or certified mental health professional seven days per week. Crossroads contracts with a psychiatrist who provides mental health services to the inmates in addition to the psychologist, mental health counselor, and chemical dependency counselors on staff. Dawson County has a licensed therapist on staff and provides individual mental health counseling to inmates. Inmates at any prison facility within the system who require intense mental health counseling are returned to MSP.

¶8 MSP allows prisoner visitation depending on the particular inmate's security designation. As presented herein, MSP's visitation periods are Wednesday through

Sunday from 2:00 p.m. to 8:30 p.m. Cascade County's and Crossroads' visitation periods are Saturday and Sunday from 8:30 a.m. to 5:00 p.m. Dawson County's visitation periods are Wednesday through Sunday from 2:00 p.m. to 9:00 p.m. At all of the regional and private prisons, inmates are offered a minimum of seventeen hours of visitation per week.

¶9 MSP offers the following educational opportunities: adult basic education, business courses, college courses, community reintegration, correspondence courses, GED programs, information processing courses, lumber processing courses, technology courses, agriculture equipment courses, auto mechanics courses, cannery processing courses, driver's training, heavy equipment training, machining, and welding. The regional and private prisons all offer GED programs. Further, Cascade County offers inmates training in hygiene, nutrition, physical fitness, stress management, and prevention of sexually transmitted diseases. Dawson County offers post-GED courses, adult basic education, computer skills, pre-health biology, and science. Crossroads offers adult basic education, carpentry, correspondence college courses through Ohio University, computer training, information management, life skills, and typing.

¶10 The Inmates were sentenced to imprisonment terms at MSP prior to 1999. Their original complaint was filed pro se, but the District Court subsequently certified the complaint as a class action and appointed counsel for the Inmates. Since originally incarcerated, Inmates have been transferred from MSP to the regional and private prisons. The Inmates sought a declaratory judgment from the District Court that prisoners

4

sentenced to MSP prior to 1999 must be confined at MSP, and not in the regional and private prisons, and that the regional and private prisons do not have the same opportunities for treatment, training, and rehabilitation as MSP, rendering their incarceration unlawful.

¶11 The District Court granted summary judgment to the DOC on all of the Inmates' claims, from which the Inmates appeal.

*Factual and Procedural History*
*Specific to Brown*

¶12 In 1976, Brown was sentenced to MSP for 194 years. Brown made an appearance before the Montana Board of Pardons and Parole where his request for parole was denied due to his numerous disciplinary violations, which had led to his high security classification and had disqualified him from sex offender treatment that was required for parole. In order to be eligible for sex offender treatment, an inmate must be given a low security classification. Brown was briefly classified as low security in June of 2003, but was returned to a high security classification two months later. Brown was subsequently transferred to Crossroads. Crossroads does not offer sex offender treatment. The DOC has a system-wide waiting list for sex offender treatment. When an inmate in a regional facility becomes eligible for sex offender treatment, he is transferred back to MSP. The transfer back to MSP for sex offender treatment only takes place if the prisoner has a low security classification.

¶13 On March 5, 2004, Brown filed a petition for injunctive relief with the District Court, asking the District Court to order DOC to transfer him back to MSP, and further,

5

to require that he be placed in a low security classification so that he can obtain sex offender treatment. The District Court granted summary judgment to the DOC on all of Brown's claims, from which Brown appeals.

**STANDARD OF REVIEW**

¶14 The standard of review for a district court's grant of summary judgment is de novo. *Casiano v. Greenway Enterprises, Inc.*, 2002 MT 93, ¶ 13, 309 Mont. 358, ¶ 13, 47 P.3d 432, ¶ 13. Summary judgment is only proper when no genuine issues of material fact exist such that the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c). "The initial burden is on the moving party to demonstrate 'a complete absence of any genuine issue as to all facts considered material in light of the substantive principles that entitle the moving party to judgment as a matter of law and all reasonable inferences are to be drawn in favor of the party opposing summary judgment.'" *Schmidt v. Washington Contractors Group*, 1998 MT 194, ¶ 7, 290 Mont. 276, ¶ 7, 964 P.2d 34, ¶ 7. "Once the moving party meets this burden, the burden shifts to the non-moving party to establish otherwise." *Schmidt*, ¶ 7.

**DISCUSSION**

**Issue 1.**

¶15 *Did the District Court err in granting DOC's motion for summary judgment in Quigg, et. al. v. DOC?*

¶16 The Inmates contend they are entitled to be housed at MSP in Deer Lodge. They base this argument on several grounds. First, the Inmates argue they have a protected liberty interest in being housed at MSP in Deer Lodge on the basis of Montana's

constitutional provisions on cruel and unusual punishment, individual dignity, and reformation. Second, the Inmates claim a state-created liberty interest in incarceration solely at MSP based on Chapter 491, Laws of Montana, 1999, § 24, which contains a "savings clause" that provides the 1999 amendment to § 53-30-101, MCA, does not affect any rights and duties that had begun prior to the enactment of the savings clause on April 27, 1999. We will address each of the Inmates' contentions in turn.

*Cruel and Unusual Punishment*

¶17 The Inmates claim their right to be free from cruel and unusual punishment, as prescribed by Article II, Section 22, of the Montana Constitution, has been violated because the regional and private prisons do not offer the same programming as offered at MSP. Specifically, the Inmates contend that differences in the availability of medical care, particularly mental health care, visitation, exercise, and education between MSP and the regional and private prisons constitute cruel and unusual punishment and "deprive the inmates of individual dignity." The Inmates also argue that Article II, Section 28, of the Montana Constitution, which prescribes one of the State of Montana's goals for the criminal justice system as reformation, has been violated because of the alleged differences between MSP and the other prisons.

¶18 We have looked to federal law for guidance on the issue of cruel and unusual punishment. "The Constitution 'does not mandate comfortable prisons' . . . ." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)). However, "the treatment a prisoner

receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31, 113 S. Ct. 2475, 2480 (1993).

¶19     The United States Supreme Court has held that "a prison official violates the Eighth Amendment only when two requirements are met"—first, the deprivation alleged must be, objectively, sufficiently serious, resulting in the denial of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977 (citing *Rhodes*, 452 U.S. at 349, 101 S. Ct. at 2399). The second requirement "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment,'" *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977 (citing *Wilson* v. *Seiter*, 501 U.S. 294, 297, 111 S. Ct. 2321, 2323 (1991)), which requires that a prison official must act with a state of mind of "deliberate indifference" to the inmate's health or safety. *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977. Deliberate indifference requires a state of mind more blameworthy than negligence, but "less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835, 114 S. Ct. at 1978. Prison officials are accorded wide ranging deference in implementing policies to preserve order and discipline among inmates. *Jellison v. Mahoney*, 1999 MT 217, ¶ 12, 295 Mont. 540, ¶ 12, 986 P.2d 1089, ¶ 12.

¶20     Additionally, we have held that Article II, Section 22, of the Montana Constitution provides Montana citizens with greater protections from cruel and unusual punishment than does the federal constitution. *Walker v. State*, 2003 MT 134, ¶ 73, 316 Mont. 103,

¶ 73, 68 P.3d 872, ¶ 73.  In their arguments, Inmates place heavy emphasis on this increased protection and contend that their placements within the state correctional system cannot withstand scrutiny under the Montana Constitution.

¶21     First, in regard to medical care, the Inmates make no specific contention as to any alleged difference in treatment between MSP and the regional and private prisons, except to merely point out there are "differences," which they equate to cruel and unusual punishment.  Conversely, the DOC argues that because the regional and private prisons operate on-site medical clinics with nursing and mid-level care, contract with private providers for on-site physician services, and transfer inmates who require acute care to MSP for treatment, there is no evidence of an alleged difference of care between MSP and the regional and private prisons that would constitute cruel and unusual punishment.

¶22     In regard to visitation, the Inmates contend their right to individual dignity and to be free from cruel and unusual punishment has been violated because the other prisons only allow visitation on Saturdays and Sundays as compared to five days a week at MSP. The DOC responds that at all of the other prisons, inmates are offered a minimum of seventeen hours of visitation per week and that Dawson County offers five days a week of visitation.  The DOC argues that, under constitutional standards, the differences between visitation hours at the other prisons and MSP do not constitute cruel and unusual punishment.

¶23     In regard to education, the Inmates make no specific argument, only generally contending that "differences in education and other capacity-developing activity"

9

between MSP and the regional and private prisons constitute cruel and unusual punishment. In response, the DOC points out that all the other prisons offer treatment opportunities on chemical dependency, alcoholics anonymous, parenting, cognitive principles, anger management, and, except for Cascade County, Native American-specific opportunities. Cascade County offers inmates training in hygiene, nutrition, physical fitness, stress management, and prevention of sexually transmitted diseases. Dawson County offers inmates the opportunity to earn their GED and also offers post-GED courses, adult basic education, computer skills, pre-health biology, and science. Finally, Crossroads offers adult basic education, GED training, carpentry, correspondence college courses through Ohio University, computer training, information management, life skills, and typing.

¶24 In regard to exercise and recreation, the Inmates argue that recreation opportunities at MSP are "more substantial" than that of the regional and private prisons. Inmates do not highlight any specific difference between MSP and the other prisons in respect to recreation, except to generally point to the policies and handbooks of the various prisons.

¶25 We conclude that any differences between medical care, visitation, education and recreation at MSP and the private and regional prisons do not rise to the level of cruel and unusual punishment as prescribed by both the Eighth Amendment of the United States Constitution and Article II, Section 22, of the Montana Constitution. The record does not reveal evidence from the Inmates that any difference in treatment between MSP and the

regional and private prisons creates a serious deprivation in their treatment or has created conditions that are "unnecessary and wanton." *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977. Further, we cannot conclude that the Inmates have presented evidence demonstrating that the DOC has acted with "deliberate indifference" to their health or safety. *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977.

¶26 The Inmates correctly offer that in *Walker*, we interpreted Article II, Section 22, along with Article II, Section 4, of the Montana Constitution. There we explained that:

> [W]hile we will analyze most cruel and unusual punishment questions implicating Article II, Section 22 of Montana's Constitution by reference to that section alone, in certain instances where Montana's constitutional right to individual dignity (Article II, Section 4) is also specially implicated, we must, of necessity, consider and address the effect of that constitutional mandate on the question before us.

*Walker*, ¶ 75. The Inmates argue that Article II, Sections 22 and 4, "are not looked at separately" and that the alleged differences between their treatment at MSP and the regional and private prisons violate both of the above-cited provisions of the Montana Constitution, thus affording further protection. We note, however, that the Inmates' argument ignores the text of *Walker*, ¶ 75, which stated that "most" questions involving Article II, Section 22, will be examined "by reference to that section alone . . . ." *Walker* does not explicitly require an analysis of Article II, Sections 22 *and* 4, in all questions implicating cruel and unusual punishment.

¶27 As the District Court correctly noted, *Walker* "is a very fact-specific case and clearly is distinguishable from what [Inmates] have alleged here." *Walker* involved a mentally ill inmate who was forced to endure a series of Behavior Management Plans

11

(BMPs) while he was imprisoned at MSP. The BMPs at issue in *Walker* were designed to curtail dangerous behavior and resulted in Walker being detained in a cell while naked, without mattress, pillow or usual bedding, sleeping on a concrete slab, having the water turned off to his sink and toilet, having no hot meals and having food passed through the same opening as toilet cleaning supplies, while his mental health was not properly monitored. *Walker*, ¶¶ 18-28. The Court noted testimony that the subject cells contained blood, feces and vomit. *Walker*, ¶¶ 77-78. We held that these conditions violated Walker's right to human dignity and constituted cruel and unusual punishment by exacerbating Walker's mental health condition. *Walker*, ¶ 84.

¶28 We conclude that *Walker* is factually distinguishable from the contentions of the Inmates here. First, the Inmates have presented no evidence that any differences between MSP and the regional and private prisons have exacerbated their mental health conditions. Second, the alleged differences the Inmates have presented regarding health care, education, visitation, and recreation among the state's facilities clearly do not rise to the level of "unnecessary and wanton" punishment which occurred in *Walker*. As such, *Walker* does not render unconstitutional the treatment conditions challenged here.

*Reformation*

¶29 The Inmates further contend that by being placed in the regional and private prisons, the DOC has deprived them of their rights under Article II, Section 28, of the Montana Constitution. This section, entitled "Rights of the convicted," provides that laws for the punishment of crime shall be founded on the principle of reformation, among

12

others.  Under Article II, Section 28, the State may limit or abrogate the rights of an inmate, as long as it is done for reformation of the inmate.  *Worden v. Montana Bd. of Pardons and Parole*, 1998 MT 168, ¶ 34, 289 Mont. 459, ¶ 34, 962 P.2d 1157, ¶ 34.

¶30    We agree with the DOC that the Inmates have failed to point to any law or policy that is not founded on principles of reformation.  Inmates merely generally contend that the differences in treatment between MSP and the regional and private prisons violates the Montana Constitution's mandate that laws for punishment of crime be founded upon reformation.  Without more, we cannot conclude that any state constitutional violation has taken place in respect to Article II, Section 28.

*Inmates' Liberty Interest in Being Housed at MSP*

¶31    In *Wright v. Mahoney*, 2003 MT 141, 316 Mont. 173, 71 P.3d 1195, we addressed whether an inmate possesses a state-created liberty interest in being housed solely at MSP.  In *Wright*, we first cited federal case law:

> [G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution.  The Constitution does not require that the State have more than one prison for convicted felons; nor does it guarantee that the convicted prisoner will be placed in any particular prison if, as is likely, the State has more than one correctional institution . . . .  The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.

*Wright*, ¶ 8 (citing *Meachum v. Fano*, 427 U.S. 215, 224-25, 96 S. Ct. 2532, 2538 (1976)).  We concluded that an inmate does not have a constitutional right to be imprisoned in any particular facility.  *Wright*, ¶ 8.

13

¶32 Wright nevertheless argued that he had a state-created liberty interest in not being transferred from MSP. Wright based this argument on the wording of the Montana laws in effect at the time of his sentencing. *Wright*, ¶ 9. We explained that in order for a state to create a liberty interest, it must first enact a law that establishes a "right of real substance," and that, even then, statutorily-defined liberty interests are restricted to freedom from "atypical and significant hardships in relation to the ordinary incidents of prison life" or restraints which "inevitably affect[ ] the duration of the prisoner's confinement." *Wright*, ¶ 9 (citing *McDermott v. Montana Dept. of Corrections*, 2001 MT 134, ¶ 11, 305 Mont. 462, ¶ 11, 29 P.3d 992, ¶ 11).

¶33 Wright argued that the 1995 statutory definition of "state prison" established a "right of real substance" to be housed solely at MSP. However, we held that even if this Court were to determine that the 1995 definition of "state prison" conferred a right of real substance, the right would be restricted to freedom from "atypical and significant hardships in relation to the ordinary incidents of prison life" or restraints which "inevitably affect[ ] the duration of the prisoner's confinement," and being transferred from one prison to another, even out of state, "is neither an 'atypical and significant' hardship in relation to the ordinary incidents of prison life, nor does it 'inevitably affect the duration' of Wright's confinement." *Wright*, ¶ 10 (citing *McDermott*, ¶ 11). We concluded that "Montana retains the discretion to transfer a prisoner for whatever reason or no reason at all; the laws in effect at the time of Wright's sentencing did not impose conditions on its discretionary power to transfer prisoners" and finally, that "Wright does

14

not have a state-created liberty interest in not being transferred to or from any correctional facility." *Wright*, ¶ 11.

¶34 The District Court relied on the above-cited language from *Wright* in concluding that the Inmates do not have a state-created liberty interest in being housed solely at MSP. The Inmates contend this language from *Wright* is dicta as "*Wright* . . . only dealt with Wright's *ex post facto* argument" and thus, the District Court erroneously reached its conclusion through its reliance on these dicta. We disagree. On appeal, Wright made three arguments: (1) the DOC lacked authority to transfer Wright outside of MSP based on the language of his written judgment and by virtue of having a liberty interest in not being transferred; (2) transferring Wright outside of MSP violated the prohibition against *ex post facto* legislation; and (3) transferring Wright outside of MSP violated equal protection under the Fourteenth Amendment to the United States Constitution. We reached our holding in *Wright* by analyzing Wright's alleged state-created liberty interest in not being transferred from MSP. Because we determined none of Wright's substantial rights were implicated by being transferred, it was not necessary to determine whether a transfer violated the prohibition against *ex post facto* legislation. *Wright*, ¶ 12. Thus, the reasoning from *Wright* regarding an inmate's alleged state-created liberty interest in being housed at MSP is not dicta and is applicable to the case at bar.

¶35 The facts involving the judgments and sentences of the Inmates and Wright are substantially similar. Like the Inmates, Wright was sentenced to MSP prior to 1999, when the only available correctional facility was MSP. Also like the Inmates, Wright has

15

been transferred to one or more of the regional and private prisons. As we determined that "none of Wright's substantial rights are implicated by his being housed at a correctional facility other than the prison at Deer Lodge," *Wright*, ¶ 12, we likewise conclude here that none of the Inmates' substantial rights are implicated by being housed at the regional and private prisons. In other words, the Inmates do not possess a state-created liberty interest in being housed at MSP.

¶36 In 1999, the Montana Legislature enacted Chapter 491, Laws of Montana, 1999. The result was the amendment of § 53-30-101, MCA, to include the regional and private prisons as state prisons under Montana law. Prior to 1999, the only statutorily defined state prison was MSP. Chapter 491, Laws of Montana, 1999, § 24, also contained a savings clause which stated: "[This act] does not affect rights and duties that matured, penalties that were incurred, or proceedings that were began before [the effective date of this act]."

¶37 The Inmates argue that the savings clause in Chapter 491, Laws of Montana, 1999, § 24, conferred a liberty interest in incarceration at MSP. Inmates moreover assert the amendment to § 53-30-101, MCA, in 1999 cannot affect their liberty interest in being housed solely at MSP because their sentences fall under the savings clause in that the sentences were penalties that were incurred before 1999. The DOC responds that at the time of the 1999 legislation, the Inmates did not have a right, per se, to imprisonment at MSP because MSP was the only imprisonment available. Thus, the DOC argues the Inmates have failed to demonstrate how the amendments to § 53-30-101, MCA, affected

16

any penalties incurred by the Inmates' initial convictions to create a right of real substance. Furthermore, the DOC points out that the penalty provisions of Title 45, MCA (of which the majority of the Inmates have been sentenced pursuant to), have always provided for imprisonment in the *state prison*, not specifically imprisonment at MSP.

¶38 As we have already concluded the Inmates do not possess a state-created liberty interest in being housed solely at MSP, pursuant to our holding in *Wright*, we must in turn conclude that the savings clause of Chapter 491, Laws of Montana, 1999, does not provide the Inmates a right to be housed solely at MSP. We agree with the DOC that the savings clause does not confer on the Inmates a special right to be incarcerated at MSP when that right did not previously exist.

¶39 The District Court properly concluded that there are no genuine issues of material fact here and that the DOC was entitled to judgment as a matter of law.

¶40 The judgment of the District Court is affirmed.

**Issue 2.**

¶41 *Did the District Court err in granting DOC's motion for summary judgment in Brown v. DOC?*

¶42 Brown makes three arguments in support of his request for an order that DOC must transfer him back to MSP and to further place him as a low security classification so that he can obtain sex offender treatment. We will only address Brown's first argument, regarding his liberty interest in parole and due process, and not address his arguments

regarding his rights under the Montana Constitution as they have been addressed above in *Quigg v. DOC*.

¶43　Brown first contends that he enjoys a liberty interest in being placed in the low security classification at MSP. Brown argues that because he requires sex offender treatment to be granted parole, he must be allowed to reside in low security at MSP because only low security classification prisoners are allowed to attend sex offender treatment. Brown alleges that the DOC has denied him the opportunity to attend sex offender treatment by not designating him as a low security prisoner. Brown concludes that this amounts to a denial of his right to due process.

¶44　The DOC concedes that Brown possesses a liberty interest in parole. *Board of Pardons v. Allen*, 482 U.S. 369, 381, 107 S. Ct. 2415, 2422 (1987); *Sage v. Gamble*, 279 Mont. 459, 464, 929 P.2d 822, 825 (1996). As the DOC correctly points out, the Due Process Clause "prohibits states from depriving any person of life, liberty or property without due process of law." *Campbell v. Mahoney*, 2001 MT 146, ¶ 7, 306 Mont. 45, ¶ 7, 29 P.3d 1034, ¶ 7. Thus, if Brown possesses a liberty interest, the question becomes what process Brown is due. *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S. Ct. 2384, 2393 (2005).

¶45　In *Sage*, we adopted the United States Supreme Court's reasoning that "due process in the context of parole does not require 'repeated, adversary hearings . . . .'" Moreover, we explained "at minimum, . . . the prisoner be provided an opportunity to be heard and a written statement explaining why he was denied parole." *Sage*, 279 Mont. at

18

465, 929 P.2d at 825 (citing *Greenholtz v. Inmates of Neb. Penal and Correctional Complex*, 442 U.S. 1, 14, 16, 99 S. Ct. 2100, 2107-08 (1979)).

¶46   Brown has admitted that he received an opportunity to be heard at his January 2003 parole hearing and received a written statement explaining why he was denied the opportunity for parole. The DOC presented evidence that it has taken no action to interfere with Brown's opportunity for parole and moreover, that Brown's status on the waiting list for sex offender treatment is the same whether he is at MSP or one of the regional and private prisons. The DOC further presented evidence that Brown will be transferred to MSP if or when his name reaches the top of the waiting list for sex offender treatment. The DOC points out that whether or not Brown achieves low security designation is completely based on his own conduct.

¶47   We conclude that while Brown has a liberty interest in the opportunity for parole, the DOC has done nothing to impede his opportunities for parole. Brown has gone through the requisite parole hearings and has been notified in writing of the reasoning behind the DOC's denial of his parole. As such, Brown's rights to due process in relation to his liberty interest in parole have not been violated.

¶48   Brown further contends that the absence of sex offender treatment at Crossroads and his inability to access sex offender treatment at MSP without being reclassified to low security classification has also violated his liberty interests and rights to due process. However, we have held that custody classifications do not "generally implicate a liberty interest sufficient to give rise to due process protection for an inmate." *Jellison*, ¶ 9. As

19

such, and particularly here, where Brown has previously been given a lower security classification by DOC, only to be increased again because of his conduct, we cannot conclude that, with respect to classification, Brown's liberty interests and due process rights have been violated.

¶49    The District Court properly concluded that there are no genuine issues of material fact here and that the DOC was entitled to judgment as a matter of law.

¶50    The judgment of the District Court is affirmed.


/S/ JIM RICE


We concur:


/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS